# COMPOSITE EXHIBIT "1"

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>FINANCIAL DESIGNS, INC.</u>
Plaintiff

Case # _____
Judge _____

vs.

<u>EVANSTON INSURANCE COMPANY</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

### III.    TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐ Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☐ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☐ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☐ Libel/Slander
      ☐ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
     ☐ Residential Evictions
     ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

  <u>2</u>

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**     **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Juan J Rodriguez</u>        Fla. Bar # <u>613843</u>
       Attorney or party                   (Bar # if attorney)

<u>Juan J Rodriguez</u>          <u>05/06/2022</u>
 (type or print name)         Date

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

FINANCIAL DESIGNS, INC.,

Plaintiff,

vs.                                                            Case No.

EVANSTON INSURANCE COMPANY,

Defendant.

## COMPLAINT

Plaintiff Financial Designs, Inc. ("FDI"), by and through its undersigned attorney, files

the instant Complaint against Defendant Evanston Insurance Company ("Evanston") and alleges

as follows:

## NATURE OF THE ACTION

1.       Plaintiff FDI, a wealth management and financial firm, is an insured under a

Professional Liability Insurance Policy with Defendant Evanston and has consistently paid the

premiums due under the subject insurance policy. Among other qualifying categories of damages,

Endorsement 27 of the subject insurance policy provides coverage up to $250,000 in the event of

a cyber security breach that results in the theft, unauthorized use, or unauthorized access of

personal information belonging to any of Plaintiff's clients.

2.       Recently, in October 2021, a hacker unlawfully accessed Plaintiff's email system

and acquired sensitive information belonging to one of Plaintiff's Clients (the "Client"). This

sensitive information enabled the hacker to fraudulently misrepresent himself as one of Plaintiff's

employees to the Client. In turn, the hacker successfully deceived the Client, which issued payment

to the hacker in the amount of $105,240.29—the exact premium amount specified in the Plaintiff and Client's medical insurance policy.

3.      When Plaintiff learned of this security breach, it immediately notified Defendant Evanston of the theft that had occurred and requested coverage for this qualifying loss. Evanston, however, refused to issue the payment that was owed to Plaintiff under Endorsement 27 of the subject insurance policy.

4.       Due to Evanston's refusal to provide coverage, the Company was forced to promptly pay its Client the full sum of $105,240.29 to prevent a lapse in the Client's employee medical insurance coverage policy, as well as to prevent any additional financial harm that would result from delays in providing this payment. Crucially, had the Company not provided prompt reimbursement to its Client, the Client would have been unable to pay its employees' health insurance, which could have irreparably damaged the business relationship between the Company and its Client.

5.      As set forth at length below, Plaintiff was entitled to coverage for this qualifying loss under Endorsement 27 of the subject insurance policy, but, to date, Evanston has failed comply with its contractual obligations. Accordingly, Plaintiff brings the instant law suit against Defendant Evanston for breach of contract, or, in the alternative, declaratory relief to recover the funds it is owed under Endorsement 27 of the Parties' Professional Liability Insurance Policy.

**PARTIES, JURISDICTION, AND VENUE**

6.      Plaintiff is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

7.      Defendant is an Illinois corporation with its principal place of business in Cook County, Illinois.

2

8.     This is an action for damages in excess of $30,000, exclusive of interest, costs, and attorney's fees, and within the subject matter jurisdiction of this Court.

9.     This court has personal jurisdiction over Defendant pursuant to Section 48.193, Florida Statutes because Defendant contracted to insure Plaintiff and its property, which are both located in Miami-Dade County, Florida.

10.     Venue is proper in Miami-Dade County, Florida because the causes of action arose in Miami-Dade County.

## **FACTS**

11.     On or around December 31, 2020, FDI and Evanston entered a Professional Liability Insurance Policy (the "Policy"). Attached hereto as **Exhibit A** is a true and correct copy of the Policy.

12.     The Policy was in effect from December 31, 2020, to December 31, 2021 (hereinafter referred to as the "Policy Period").

13.     Under the Policy, Evanston agreed to provide certain insurance coverage to FDI; Evanston was the "Insurer," and FDI was the "Insured."

14.     The Policy included an endorsement titled "CYBER MANAGEMENT WITH EXTORTION DEMAND, BUSINESS INTERRUPTION AND NETWORK RESTORATION COST COVERAGE" (hereinafter referred to as "Endorsement 27").

15.     Endorsement 27 was in effect between the parties during the Policy Period, and it provides FDI coverage up to $250,000 in qualifying damages.

16.     Endorsement 27 provides, in pertinent part, as follows:

The **Insurer** shall pay, on behalf of the **Insured** . . . **Damages** . . . which an **Insured** shall become legally obligated to pay because of actual monetary loss by the

3

**Insured's** client as the direct result of a **Security Breach**, **Privacy Violation** . . . provided a **Claim** is both made against the Insured and reported to the Insurer in writing during the **Policy Period**, or as allowed by Section **X** – Notice of Claim, or during an Extended Reporting Period, if applicable;[1]

17.     The Policy provides the following definitions for certain terms relevant to Endorsement 27:

      a.   "**Damages** means monetary judgments, settlements or awards resulting from a **Claim**[.]"

      b.   "**Security Breach** means . . . [t]he actual failure and inability to prevent . . . Unauthorized access to or unauthorized use of **Personal Information** stored in the **Insured's Computer System**[,] or [t]he theft or unauthorized copying of Personal Information on the **Insured's Computer System**."

      c.   "**Privacy Violation** means any [t]heft of **Personal Information** while in the care, custody or control of an **Insured**[.]"

      d.   "**Personal Information** means [t]he name of an **Insured's** client in combination with . . . [a]ny financial account number . . . with any required password, access code or other security code that would permit access to the financial account[.]"

      e.   "**Claim** means a written demand received by an **Insured** for **Damages** . . . because of an actual or alleged **Wrongful Act**."

18.     As such, where a qualifying loss results from the theft of (a) the name, (b) financial account number, and (c) password or security code that belongs to an FDI client, FDI is entitled to coverage under Endorsement 27 of Policy.

19.     On or about October 26, 2021, a hacker unlawfully accessed FDI's email system, where he took over an FDI employee's email account, which was protected by a password.

20.     Armed with this information, the hacker was able to fraudulently misrepresent himself as an FDI employee in email communications with FDI's Client, and he also accessed

---

[1] Terms appearing in bold font are defined within the Policy.

financial information and account numbers belonging to this Client, which were stored within the compromised email account.

21.     The hacker sent the Client an email wherein he demanded that the Client immediately pay its medical insurance policy premium to prevent a lapse in coverage.

22.     Although this Client initially expressed skepticism and questioned the need for an immediate payment, the hacker deceived the Client with the information he had unlawfully accessed on FDI's email system and urged this Client to issue payment immediately to prevent the medical insurance policy from lapsing.

23.     The hacker's plan worked. After being deceived into believing that it was communicating with an FDI employee, the Client issued payment in the amount of $105,240.29— the exact premium amount specified in the FDI and Client's medical insurance policy—to the hacker, not to FDI as the Client thought.

24.     FDI did not discover this security breach until December 1, 2021, when the policy between FDI and the Client lapsed because FDI had not received the premium payment owed under their policy.

25.     FDI learned that it did not receive the premium payment because the Client had paid this premium to the hacker, not FDI. Once FDI learned it had been the victim of a Security Breach and that the Client was the victim of a Privacy Violation, it immediately reported this hack and theft to Evanston. Evanston, however, denied coverage.

26.     Following Evanston's denial of coverage, FDI was forced to settle the matter and promptly pay its Client the full sum of $105,240.29 to prevent a lapse in the Client's employee

medical insurance coverage policy, as well as to prevent any additional financial harm that would result from delays in providing this payment.

27.     Importantly, had FDI not provided prompt reimbursement to its Client, the Client would have been unable to pay its employees' health insurance, which could have irreparably damaged the business relationship between FDI and its Client.

**COUNT I**
**BREACH OF CONTRACT**

28.     Plaintiff incorporates and realleges paragraphs 1 through 27 above as if fully set forth herein.

29.     On December 31, 2020, FDI and Evanston entered into a valid, enforceable, and binding contract—the Policy.

30.     FDI tendered to Evanston the premium payment it owed under the Policy in full consideration for this Policy.

31.     In exchange for FDI tendering this premium, Evanston promised to provide certain insurance coverage to FDI.

32.     FDI fulfilled its obligations and thus performed under the Policy by paying Evanston the premium it owed Evanston.

33.     FDI's Client sought reimbursement from FDI due to the privacy violation, which constitutes a "Claim" under the Policy. The Client made this Claim during the Policy Period, and FDI reported the Client's Claim to Evanston during the Policy Period.

34.     FDI has performed all conditions precedent that are required under the Policy. As such, all conditions precedent have been satisfied, have occurred, or have been waived.

35.     Evanston materially and substantially breached the Policy by failing to provide coverage to FDI for a qualifying loss under Endorsement 27 of the Policy.

36.     Specifically, Evanston is obligated to pay FDI under Endorsement 27 of the Policy because FDI's Client suffered an "actual monetary loss . . .  as the direct result of a **Security Breach**, [or] **Privacy Violation**," and this actual monetary loss suffered by the Client constitutes "Damages" incurred by FDI following its reimbursement of the Client.

37.     The hacking constitutes a "Security Breach" and a "Privacy Violation" under the Policy because the hacker, without authorization, accessed the Client's "Personal Information," which was stored on the FDI employee's email account.

38.     The information the hacker accessed and used without authorization constitutes "Personal Information" under the Policy because he accessed and used "[t]he name of an Insured's client in combination with . . . [a]ny financial account number . . . with any required password, access code or other security code that would permit access to the financial account[.]"

39.     In particular, through his hack, the hacker accessed:

   a.  The Client's name and other identifying information which was stored on the compromised FDI employee's email account;

   b.  The financial account number of the Client because it maintained a medical insurance policy with FDI which was labeled and identified by a number unique to this account; and

   c.  A password, access code or other security code which permits access to this financial account because a password or code was needed to take over the compromised FDI employee's email account, and such password or code thereby permitted the hacker to access said financial account of Client.

40.     As such, this hacking constitutes a Privacy Violation under the Policy because the hacker committed "theft of Personal Information while in the care, custody or control of an Insured[.]"

41.     Moreover, this hacking is a Security Breach under the Policy because it constitutes "the actual failure and inability to prevent . . . unauthorized access to or unauthorized use of Personal Information stored in the Insured's Computer System[,] or [t]he theft or unauthorized copying of Personal Information on the Insured's Computer System."

42.     FDI suffered "Damages" under the Policy because the reimbursement that was disbursed to the Client constitutes a "[settlement] . . .  resulting from a Claim" by its Client.

43.     As a result of Evanston materially and substantially breaching the Policy by not providing coverage, FDI suffered significant pecuniary damages.

44.     These damages flow directly from and are the natural and probable consequences of Evanston's breach of the Policy.

45.     As a result of Evanston's breach, FDI has also suffered consequential damages.

46.     These consequential damages were a proximate result of Evanston's material and substantial breach of the Policy, and they were reasonably foreseeable by Evanston at the time of contracting.

47.     Specifically, because Evanston knew that FDI provided prompt reimbursement to its Client to pay its employees' health insurance and the failure to do so could have irreparably damaged the business relationship between FDI and its Client, the consequential damages arising from Evanston's breach in failing to provide coverage were reasonably foreseeable.

**WHEREFORE**, Plaintiff FDI demands judgment against Defendant Evanston for damages, including general, direct, and consequential damages, in an amount to be determined at trial, costs, interest, and reasonable attorneys' fees, and any other relief the Court deems just and proper.

## <u>COUNT II</u>
## <u>DECLARATORY RELIEF</u>

48.     Plaintiff incorporates and realleges paragraphs 1 through 27 above as if fully set forth herein.

49.     There is a bona fide controversy between the parties, namely whether FDI is entitled to payment pursuant to Endorsement 27 the Policy.

50.     The Parties are in doubt as their rights or privileges under the Policy because there are competing interpretations of Endorsement 27 of the Policy.

51.     Specifically, Evanston disputes Plaintiff's entitlement to coverage because, according to Defendant, the information that was stolen by the hacker does not constitute "personal information" belonging to Plaintiff's Client, as that term is defined in Endorsement 27 of the Policy.

52.     FDI is entitled to have such doubt removed.

53.     Accordingly, pursuant to Fla. R. Civ. P. 1.110, FDI requests, in the alternative to its claim for breach of contract, declaratory relief against Evanston.

**WHEREFORE**, Plaintiff FDI respectfully requests that a judgment be entered declaring and adjudicating the Parties rights and duties pursuant to the Policy, a judgment be entered declaring and adjudicating that all conditions precedent of the Policy have been satisfied, have occurred, or have been waived, that a judgment be entered declaring and adjudicating that FDI is entitled to coverage by Evanston for a qualifying loss under Endorsement 27 the Policy, and that FDI be awarded attorney fees, costs of suit, and any other relief deemed proper by the Court.

## <u>JURY TRIAL DEMAND</u>
Plaintiff demands a trial by jury on all claims and issues so triable.

9

Dated: May 6, 2022                              Respectfully submitted

**CAREY RODRIGUEZ MILIAN, LLP**
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Tel.:   (305) 372-7474
Fax:   (305) 372-7475

By:  */s/ Juan J. Rodriguez*
Juan J. Rodriguez (FBN 613843)
Email: jrodriguez@careyrodriguez.com
Secondary: cperez@careyrodriguez.com
Andy Hernandez (FBN 1018581)
Email: ahernandez@careyrodriguez.com
Secondary: cperez@careyrodriguez.com

# <u>Exhibit A</u>

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

10275 West Higgins Road
Suite 750, Rosemont , IL  60018

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                                                      **President**



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS –
## NOTICES AND CLAIM REPORTING

Our address for any notice pursuant to the conditions of the policy is:

Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone:  800-362-7535 (800) 3MARKEL
Fax:  855-662-7535 (855) 6MARKEL

To report a **Claim**, or a **Wrongful Act** reasonably expected to give rise to a **Claim**, send written notice to the address shown above to the attention of Markel Claims, or send by email to:

newclaims@markel.com



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                                                                     Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>● your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>● your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>● your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>● publicly-available information from government records;<br><br>● de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –**<br><br>such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –**<br><br>to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –**<br><br>information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –**<br><br>information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you<br><br>• complete an application or other form for insurance<br><br>• perform transactions with Us, Our Affiliates, or others<br><br>• file an insurance claim or provide account information<br><br>• use your credit or debit card<br><br>We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only<br><br>• sharing for Affiliates' everyday business purposes – information about your creditworthiness<br><br>• Affiliates from using your information to market to you<br><br>• sharing for Nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. |
| | • Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. |
| | • Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you. |
| | • Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. <br><br> We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information. <br><br> For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |



**INTERLINE**

# EVANSTON INSURANCE COMPANY

## COMMON POLICY SURPLUS LINES NOTIFICATION
## SUPPLEMENT TO DECLARATIONS



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# Evanston Insurance Company

**MARKEL®**

## BROKER/DEALER AND REGISTERED REPRESENTATIVES
## PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATION

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE. IN ADDITION, CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

POLICY NUMBER.: MKLV7PLBD00034          RENEWAL OF MASTER POLICY:  MKLV7PLBD00025

**Broker/Dealer Policy Holder** and Mailing Address (No., Street, Town or City, County, State, Zip Code)

**THE LEADERS GROUP, INC.**
**26 W. DRY CREEK CIRCLE, SUITE 800**
**LITTLETON, CO 80120**

Policy Period: From  12/31/2020   to  12/31/2021      at 12:01 A.M. Standard Time at the mailing address shown above.

Retroactive Date:    7/1/1996                            The Policy inception date will apply unless noted otherwise here.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Limits Of Liability | | | |
|---|---|---|---|
| Registered Representative Each Claim | $ 1,000,000 | Broker/Dealer Each Claim | $ 1,000,000 |
| Registered Representative Aggregate | $ 10,000,000 | Broker/Dealer Aggregate | $ 10,000,000 |
| Policy Aggregate | $ 10,000,000 | | |

| Retention | | |
|---|---|---|
| Registered Representative Each Claim: | $5,000 | Broker/Dealer Each Claim          $ 50,000 |
| Registered Representative Company: | $10,000 | |

| Premium | | |
|---|---|---|
| Deposit Premium          $625,000 | Registered Representative Rate:          $1,150 | |
| | Non-Registered Representative Rate:  $ 455 | |

| Endorsements |
|---|

Forms and Endorsements applying to and made part of this Policy at time of issue:

**POLICY JACKET**
**NOTICE TO POLICYHOLDERS – NOTICES AND CLAIM REPORTING**
**PRIVACY NOTICE**
**COMMON POLICY SURPLUS LINES NOTIFICATION SUPPLEMENT TO DECLARATIONS**
**U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS**
**BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATION**
**BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY NON-STACKING ENDORSEMENT**
**BROKER/DEALER VICARIOUS LIABILITY ENDORSEMENT**
**LIMITED SELLING AWAY COVERAGE ENDORSEMENT**
**SPECIFIC PRODUCTS EXCLUSION ENDORSEMENT**
**NEW YORK AMENDATORY ENDORSEMENT**
**SOCIAL ENGINEERING CLAIM COVERAGE ENDORSEMENT**
**ADDITIONAL INSURED ENDORSEMENT**
**AMENDMENTS TO DEFINITION OF CLAIM AND EXCLUSION B.3 ENDORSEMENT**
**ADVISOR ASSOCIATES ENDORSEMENT**
**ALTERNATIVE PRODUCTS SUBLIMIT ENDORSEMENT**
**AMENDED DEFINITION OF PROFESSIONAL SERVICES ENDORSEMENT**
**AMENDED DEFINITION OF RETROACTIVE DATE ENDORSEMENT**
**AMENDED INDIVIDUAL EXTENDED REPORTING PERIOD ENDORSEMENT**
**AMENDED GROUP EXTENDED REPORTING PERIOD ENDORSEMENT**
**AMENDED EXCLUSION K ENDORSEMENT**
**BGA ENDORSEMENT**
**DISCRETIONARY AUTHORITY ENDORSEMENT**
**IMO ENDORSEMENT (VICARIOUS LIABILITY CLAIMS EXPENSES ONLY)**
**LIFE, ACCIDENT & HEALTH ENDORSEMENT**
**LIFE SETTLEMENT REFERRAL ENDORSEMENT**
**LIMITED PARTNERSHIP/REIT INSOLVENCY EXCLUSION ENDORSEMENT**
**PROPERTY AND CASUALTY PRODUCTS COVERAGE ENDORSEMENT**
**TRADE ERROR REIMBURSEMENT ENDORSEMENT**
**BROKER/DEALER FIDUCIARY STANDARD OF CARE ENDORSEMENT**
**NON-REGISTERED REPRESENTATIVE COVERAGE ENDORSEMENT**
**BROKERAGE GENERAL AGENCY OPTIONAL LIMITS OF LIABILITY ENDORSEMENT**
**CYBER MANAGEMENT WITH EXTORTION DEMAND, BUSINESS INTERRUPTION AND NETWORK RESTORATION COST COVERAGE ENDORSEMENT**
**SERVICE OF SUIT**
**TRADE OR ECONOMIC SANCTIONS**

| Producer Number, Name and Mailing Address |
|---|

**ARTHUR J. GALLAGHER & CO. INSURANCE BROKERS OF CALIFORNIA, INC.**
**18201 VON KARMAN AVE., SUITE 200**
**IRVINE, CA 92612**

**These declarations, together with the completed and signed Application, the Policy and any Endorsement(s) attached hereto, shall constitute the contract between the Insurer and Insureds.**

Countersigned: _____03/09/2021_____  By: _____
                          **DATE**                              **AUTHORIZED REPRESENTATIVE**



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

## BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

**PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.**

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE. IN ADDITION, CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

**WORDS OR PHRASES IN BOLD MAY HAVE SPECIAL MEANING. REFER TO SECTION IV – DEFINITIONS.**

In consideration of the payment of premiums and in reliance upon the statements contained in the **Application**, which is incorporated into this Policy and forms a part hereof, and subject to the terms, limitations, conditions and exclusions of this Policy, the **Insurer**, agrees as follows:

## SECTION I – INSURING AGREEMENT

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

**A.** Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**B.** As of the inception date of this Policy as stated in the Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**.

## SECTION II – DEFENSE AND CLAIM EXPENSES

**A.** The **Insurer** shall have the right and duty to defend a **Claim** against an **Insured** seeking **Damages** that is covered by this Policy.

**B.** The **Insurer's** right and duty to defend a **Claim**, as well as all other obligations under this Policy, shall terminate when the applicable Limit Of Liability Each Claim is paid by the **Insurer** for **Damages** or **Claim Expenses**, regardless of whether a **Claim** continues to proceed against an **Insured**. The **Insurer's** rights and duties with respect to each **Insured** separately to defend all **Claims**, as well as all other obligations under this Policy, shall terminate upon payment of each **Insured** Aggregate Limit Of Liability for **Damages** or **Claim Expenses**. The **Insurer's** obligations as to all **Claims** against all **Insureds** will terminate upon payment of the Policy Aggregate Limit Of Liability. In the event that the limits of liability are exhausted by the **Insurer's** payment of **Damages** or **Claim Expenses**, then the **Insurer** shall tender the defense to the **Insured**, who will be responsible for continued defense and payment of **Damages** and **Claim Expenses** without recourse to the Policy.

**C.** The **Insurer** shall select defense counsel for a **Claim** that is covered by this Policy and pay associated **Claim Expenses**, subject to Section **VII** – Limits Of Liability.

**D.** In the event that applicable law allows the **Insured** to control selection of defense counsel when a conflict of interest arises between the **Insured** and **Insurer**, the **Insurer** will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who shall act solely in the interest of the **Insured**, and the **Insured** shall direct such defense counsel to cooperate with the **Insurer**. Such cooperation shall include, without limitation:

1. Providing on a regular basis, but no less frequently than every 3 months, written reports on alleged **Damages**, potential liability, progress of any litigation or arbitration, any settlement demands and any investigation developments that materially affect the **Claim**;

2. Providing any other reasonable information requested;

3. Submission of itemized billing on a periodic basis at rates which are paid by the **Insurer** to other attorneys or law firms in the jurisdiction where the **Claim** is pending; and

4. Cooperating with the **Insurer** in resolving any discrepancies with respect to the **Claim**.

## SECTION III – SETTLEMENT OF CLAIMS

The **Insurer** shall investigate and settle a **Claim** in a manner that it deems appropriate. The **Insurer** shall not settle or compromise a **Claim** without the written consent of an **Insured**. If the **Insured** refuses to consent to a settlement or compromise acceptable to the **Insurer**, then the **Insurer's** duty to defend the **Insured** shall cease as of the date of the **Insured's** refusal to consent. Thereafter, the limit of liability applicable to such **Insured** shall be reduced to an amount equal to the **Damages** for which the **Claim** could have been settled or compromised, which amount shall not exceed the applicable Each Claim or Aggregate Limit Of Liability.

## SECTION IV – DEFINITIONS

For purposes of this Policy, the terms in bold type shall have special meanings that are designated below. All other terms shall have those meanings commonly understood by professionals who are engaged in the business of **Securities** or insurance.

**A.** **Application** means:

1. The application for this Policy and for any policy issued by the **Insurer**, or any of its affiliates, of which this Policy is a direct or indirect renewal or replacement;

2. Any attachment to any such application;

3. Any other materials submitted with or incorporated into any such application; and

4. Any documents submitted in connection with the underwriting of any such policy.

**B.** **Broker/Dealer** means the entity designated in the Declarations and any **Subsidiary**.

**C.** **Claim** means a written demand received by an **Insured** for **Damages** (including pleadings received in a civil litigation or arbitration) because of an actual or alleged **Wrongful Act**. A **Claim** does not include the following:

1. A demand for declaratory, injunctive or other non-monetary relief;

2. Any form of criminal proceeding; or

3. Any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency, including, but not limited to, any disciplinary proceedings by such official or agency, except if the agency or official is a client of the **Insured** in connection with the rendering of **Professional Services**.

**D.** **Claim Expenses** means reasonable and necessary amounts incurred by the **Insurer**, or by the **Insured** with the prior written consent of the **Insurer**, in the defense of a **Claim** that is covered under this Policy, including attorneys' fees, costs of investigation, court or arbitration costs and premiums for appeal, attachment or similar bonds. The **Insurer**, however, is not required to provide such bonds. **Claim Expenses** do not include the wages, salaries, fees or costs of the directors, officers, employees, representatives, in-house counsel, agents or servants of any **Insured**.

**E.** **Damages** means monetary judgments, settlements or awards resulting from a **Claim**. **Damages** do not include the following:

1. Taxes, fines or penalties, unless incurred by a claimant and made part of a **Claim** against an **Insured**;

2. The multiplied portion of a multiplied damage award;

3. The return, restitution, reduction, compromise or refund of commissions, fees or charges;

4. Costs incurred as a result of non-monetary, declaratory or injunctive relief;

5. Any matters that are deemed uninsurable under the law; and

6. **Claim Expenses**.

Notwithstanding above, **Damages** shall also include judgements or awards of punitive or exemplary damages in a **Claim** (where insurable according to the law of the jurisdiction in which they are awarded) in an amount limited as follows: the amount awarded, but not to exceed one hundred percent (100%) of the compensatory damages awarded in such **Claim**.  The amount of any punitive or exemplary damages payable shall be part of, and not in addition to, the applicable Limits of Liability under this Policy.

**F.** **Insured** means:

    **1.** A **Registered Representative** acting in his or her capacity as such, including:

        **a.** A corporation, partnership or other business entity owned by and in which a **Registered Representative** has an ownership interest, or in which a **Registered Representative** is an employee, but solely with respect to the liability of such organization as it arises out of a **Registered Representative's** rendering of or failing to render **Professional Services**. Coverage hereunder shall not be afforded for any actual or alleged **Wrongful Act** of such corporation, partnership or other business entity, but shall only apply to a **Claim** arising out of the actual or alleged **Wrongful Act** of a **Registered Representative**;

        **b.** A person acting on behalf of a **Registered Representative**, who was or is a partner, officer, director, stockholder or an employee of a **Registered Representative**, or the business entity of a **Registered Representative**, provided such person is not a party to a contract with any broker or dealer and only with respect to the rendering of or failing to render **Professional Services** of a **Registered Representative**; and

    **2.** The **Broker/Dealer**, or any person acting on behalf of the **Broker/Dealer** or TLG Advisors, Inc., who is a partner, officer, director, stockholder or an employee of such **Broker/Dealer** or TLG Advisors, Inc., but only for the **Professional Services** of the **Broker/Dealer** or TLG Advisors, Inc.

**G.** **Insurer** means the insurance company shown in the Declarations.

**H.** **Interrelated Wrongful Acts** mean any **Wrongful Acts** is connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**I.** **Investment Advisory Services** means advisory services rendered for a client in exchange for a fee by a **Registered Investment Adviser** pursuant to the Investment Advisers Act of 1940, and any amendments thereto, provided that prior to providing such services, the **Registered Investment Adviser** received written approval from the **Broker/Dealer** to undertake such services.

**J.** **Personal Injury Act** means libel, slander, defamation, disparagement or violation of a right to privacy committed unintentionally during the course of rendering **Professional Services**.

**K.** **Policy Period** means the period of time from the inception date and time stated in the Declarations to the earlier of the expiration date and time stated in the Declarations or the effective date and time of the cancellation of this Policy.

**L.** **Professional Services** means:

    **1.** The solicitation, sale or servicing of the following:

        **a.** Life insurance, accident and health insurance, disability income insurance and fixed annuities, provided that a **Registered Representative** who undertakes these services is properly licensed to sell such products by the appropriate governmental authorities;

        **b.** Variable insurance products, including, but not limited to, variable annuities, flexible and scheduled premium annuities and variable life insurance, provided that a **Registered Representative** who undertakes these services is properly licensed to sell such products by the appropriate governmental authorities; and

        **c.** **Securities** (other than variable annuities and variable life insurance) for the account of a client for a fee, commission or other compensation, provided that the **Securities** are authorized or approved by and actually processed through the **Broker/Dealer**.

    **2.** The solicitation, sale or administration of employee benefit plans, such as group or ordinary pension or profit sharing plans, retirement annuities and life, accident and health or disability plans, provided that the **Registered Representative** who undertakes these services is properly licensed by the appropriate governmental authorities and such employee benefit plans are funded with the products set forth in Paragraph **1.** above.

    **Professional Services** shall not include the solicitation, sale or administration of the following:

    **a.** Multiple Employer Welfare Arrangements or Voluntary Employee Beneficiary Associations, as defined by the Employee Retirement Income Security Act of 1974 and any amendments thereto; or

    **b.** Section 79, 83, 412, 419 Plans or any other plans developed to provide tax deductions and advantages under the Internal Revenue Code, amendments thereto and any regulations promulgated thereunder.

**3.** Financial planning, but only if performed directly in conjunction with the sale, solicitation or servicing of the products referenced in Paragraph **1.** above.

**4.** **Investment Advisory Services**.

**5.** With respect to the **Broker/Dealer** only, the supervision of activities of a **Registered Representative**, in accordance with statutes, regulations or procedures established by governmental or self-regulatory authorities, including, but not limited to, the Securities and Exchange Commission and Financial Industry Regulatory Authority, or duties imposed under common law, but only in connection with activities of a **Registered Representative** that are covered under this Policy.

**M.** **Registered Investment Adviser** means:

**1.** A **Registered Representative** who is registered as an "Investment Adviser", as defined by the Investment Advisers Act of 1940, and any amendments thereto, with the Securities and Exchange Commission or registered or licensed with any other appropriate governmental authorities, including a state securities commission; and

**2.** A "person associated with" a **Registered Investment Adviser**, as defined by the Investment Advisers Act of 1940, and any amendments thereto.

**N.** **Registered Representative** means an individual who:

**1.** Maintains a contract with the **Broker/Dealer** to perform **Professional Services**;

**2.** Is enrolled for coverage under this Policy, and whose enrollment is on file with the **Broker/Dealer**;

**3.** Has paid the applicable premium;

**4.** Is licensed by all necessary federal, state and local governmental authorities to render **Professional Services** where both the **Registered Representative** and a client are located; and

**5.** Is properly registered as a representative of the **Broker/Dealer** with the Financial Industry Regulatory Authority.

**O.** **Retroactive Date** means:

**1.** With respect to the **Broker/Dealer**, the date stated in the Declarations.

**2.** With respect to a **Registered Representative**, the date of the **Registered Representative's** first uninterrupted and continuously effective contract with the **Broker/Dealer**.

**P.** **Securities** shall have the same meaning as the term used in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940 or the Investment Advisors Act of 1940, and any amendments thereto.

**Q.** **Subsidiary** means a corporation in which the **Broker/Dealer**:

**1.** Owns as of the inception date of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more **Subsidiaries** and which corporation is engaged in **Professional Services**; or

**2.** Forms or acquires during the **Policy Period**, if the **Broker/Dealer** owns, directly or indirectly through one or more of its **Subsidiaries**, more than 50% of the issued and outstanding voting stock and which corporation is engaged in **Professional Services**, provided that notice of such formation or acquisition was disclosed to the **Insurer** within a reasonable time for it to consider any changes or modifications to this Policy which may be necessary, including, but not limited to, additional premium. Under no circumstances shall coverage be afforded to the newly acquired **Subsidiary** for a **Claim** arising out of or based upon a **Wrongful Act** committed prior to the date when the **Broker/Dealer** or one or more of its **Subsidiaries** acquired more than 50% of its issued and outstanding voting stock.

**R.** **Wrongful Act** means a negligent act or omission, including a **Personal Injury Act**, committed by an **Insured** in the rendering of or failing to render **Professional Services** to a client.

**SECTION V – EXCLUSIONS**

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

**A.** For any actual or alleged sickness, disease, death or other bodily injury, including, but not limited to, emotional distress and mental anguish, or damage to or destruction of property, including loss of use thereof;

**B.** Against an **Insured** by or on behalf of any:

**1.** Other **Insured**, any enterprise that owns, operates or controls an **Insured** or any enterprise that an **Insured** owns, operates or controls;

**2.** Individual, company or entity that is not a client of the **Insured**, including, but not limited to, any broker or dealer, individual securities broker, issuer of securities, insurance company or insurance agent or broker; provided, however, that this exclusion shall not apply to a **Claim** brought by or on behalf of an actual or alleged beneficiary of a product referenced in Paragraph **1.** of Definition **L.** Professional Services in Section **IV** – Definitions; or

**3.** Governmental or quasi-governmental official or agency in any capacity, including, but not limited to, the Securities and Exchange Commission, Financial Industry Regulatory Authority, the Securities Investor Protection Corporation, or any state or federal securities or insurance commission or agency; however, this exclusion shall not apply to any **Claim** brought by or on behalf of such agency or official in its capacity as a client of an **Insured**;

**C.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

**1.** Any:

**a.** **Wrongful Act** alleged in any **Claim** which has been reported, or any circumstance of which notice has been given and accepted, prior to the **Policy Period**; or

**b.** Other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** which has been the subject of such **Claim** or notice, would constitute **Interrelated Wrongful Acts**, regardless of the legal grounds upon which such **Claim** is predicated; or

**2.** Any:

**a.** **Claim**, demand, suit, proceeding or investigation of which the **Insured** had knowledge, pending on or prior to the inception date of the **Policy Period**; or

**b.** Fact, matter, circumstance, situation, transaction or event underlying or alleged in such demand, suit, proceeding, **Claim** or investigation, regardless of the legal grounds upon which such **Claim** is predicated;

**D.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any:

**1.** Actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute, by, at the direction of or with the knowledge of any **Insured**; or

**2.** Gaining of profit, remuneration or monetary advantage to which an **Insured** is not legally entitled;

However, the **Insurer** shall continue to defend a **Claim** alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for the costs of defending the **Claim**;

**E.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, investments, funds or any form of money;

**F.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged liability of others assumed by any **Insured** under an agreement, contract, guarantee or warranty unless the **Insured** would be liable in the absence of such agreement, contract, guarantee or warranty;

**G.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged rendering of services as an actuary, accountant, attorney, real estate agent, real estate broker, third-party claims administrator, property and casualty agent or broker or expert witness, regardless of whether such services are incidental to the rendering of **Professional Services**; however, this exclusion shall not apply to tax advice provided to a client as a necessary part of rendering **Professional Services**;

**H.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged placement of a client's coverage or funds, directly or indirectly with any organization, entity or vehicle of any kind, nature or structure which is not licensed or authorized to do business in the state or jurisdiction with authority to regulate such business; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement of insurance or coverage with an eligible surplus lines insurer in the state or jurisdiction with authority to regulate such business;

**I.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged insolvency, receivership, conservatorship, liquidation, bankruptcy, failure or inability to pay of any company, organization, entity, vehicle or arrangement of any nature in which an **Insured** placed, recommended to be placed or obtained coverage or in which an **Insured** placed or recommended to be placed funds or an investment of any nature; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement, recommendation for placement or obtaining coverage with an insurance company rated by A.M Best's as B+ or better at the time when coverage is placed, recommended or obtained;

**J.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any pension plan, profit sharing plan, health and welfare or any other employee benefit plan or trust sponsored by an **Insured**, in which an **Insured** is a participant, trustee or named fiduciary;

**K.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any pension plan, profit sharing plan, health and welfare or any other employee benefit plan or trust which are self-funded, in whole or in part;

**L.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any ownership, formation, operation or administration of any insurance company, captive, risk retention group, self-insurance program or purchasing group;

**M.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged:

1.   Unfair competition;

2.   Anti-competitive acts;

3.   Restraint of trade;

4.   Price fixing;

5.   Monopolization;

6.   Misuse of confidential or proprietary information;

7.   Copyright, patent, trade mark or trade secret infringement;

8.   Piracy, theft or conversion of ideas, employees, contacts or business methods; or

9.   Illegal, improper or deceptive advertisement;

**N.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged discrimination or harassment in any form or manner;

**O.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any failure, malfunction or breakdown of any computers, electrical, electronic or mechanical systems or machines;

**P.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged guarantee, promise or warranty as to interest rates, market values, earnings, future values or future premiums or payments in connection with variable life insurance, variable annuities or **Securities**;

**Q.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Securities** (other than variable life insurance and variable annuities) that were not authorized or approved by, and actually processed through, the **Broker/Dealer**;

**R.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any function of an **Insured** as a specialist or market maker for any **Securities**, an **Insured** failing to make a market for any **Securities**, or the purchase of, sale of or failure to sell **Securities** when the **Insured** is a specialist or market maker for such **Securities**;

**S.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving an **Insured's** actual or alleged exercise of discretionary authority over a client's assets, funds or liabilities, undertaking of trades or transactions on a discretionary basis or any trading or transactions without the express authority of a client; however, this exclusion shall not apply to an **Insured** providing asset allocation services pursuant to a written contract for a client's account that is funded exclusively with no-load mutual funds, no-load variable annuities, no-load variable life insurance or any investment for which no **Insured** received a commission;

**T.**   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

1. Promissory notes or viatical settlements or any **Securities** backed by a viatical settlement;

2. Commodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying **Securities**, cash or cash equivalent, not including margin;

3. Any "junk bonds" or "high yield bonds" (for purposes of this exclusion, "junk bonds" or "high yield bonds" mean bonds which, at the time of purchase or sale were unrated or rated as below investment grade by any rating agency, including, but not limited to, Moody's bonds of Ba or lower or S&P bonds of BB or lower);

4. Any **Securities** sold exclusively outside of the United States of America or Canada;

5. Actual, attempted or threatened mergers, acquisitions, divestitures, tender offers, proxy contests, leveraged buy-outs, going private transactions, reorganizations, capital restructuring, recapitalization, fairness opinions, spin-offs, primary or secondary offerings of **Securities** (regardless of whether the offering is a public offering or a private placement) or other efforts to raise or furnish capital or financing for any company, corporation, enterprise or entity or disclosure requirements in connection with any of the foregoing, as well as any other investment banking activities;

6. Structured settlements; however, this exclusion shall not apply to a **Claim** arising out of or based upon the sale or servicing of the underlying product, if otherwise covered by this Policy; and

7. Any **Securities** that are wholly or partially owned by any **Insured**;

**U.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving actual or alleged use or disclosure, aiding or abetting use or disclosure, or participation after the fact in use or disclosure of non-public or insider information as prohibited by any federal, state or local laws, statutes, regulations or ordinances, including, but not limited to, the Insider Trading and Securities Fraud Enforcement Act of 1988, Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 and any amendments thereto;

**V.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving, actual or alleged advice, consultation or recommendations of any type of mortgage, including, but not limited to, a reverse mortgage, regardless of whether an incidental part of the rendering of **Professional Services**;

## SECTION VI – TERRITORY

This insurance applies to **Wrongful Acts** committed anywhere in the world, provided that the **Claim** is made against an **Insured** in the United States of America, its territories or possessions, Puerto Rico or Canada.

## SECTION VII – LIMITS OF LIABILITY

### A. Limit Of Liability Each Claim

Subject to Paragraphs **B.** and **C.** below, the limit of the **Insurer's** liability for **Damages** and **Claim Expenses** for a **Claim** made against an **Insured** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the **Insured** Limit Of Liability Each Claim shown in the Declarations. The **Insurer's** obligations under this Policy for a **Claim** shall cease after the applicable Limit Of Liability Each Claim has been paid by the **Insurer** for **Damages** or **Claim Expenses**.

The inclusion of multiple **Insureds** in a **Claim** shall not increase the applicable Limit Of Liability Each Claim. Only one Limit Of Liability Each Claim shall apply to such a **Claim**. The Limit Of Liability Each Claim applicable to a **Claim** involving multiple **Insureds** shall be the single largest such Limit Of Liability Each Claim, in the event that different Limits Of Liability Each Claim are implicated.

### B. Limit Of Liability Aggregate

The limit of liability for **Damages** and **Claim Expenses** for all **Claims** made against any one **Insured** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Aggregate as to the **Broker/Dealer** or **Registered Representative**, shown in the Declarations. The **Insurer's** obligations under this Policy as to all **Claims** against an **Insured** shall cease after the applicable Limit Of Liability Aggregate has been paid by the **Insurer** for **Damages** or **Claim Expenses**.

If multiple **Insureds** are implicated in a **Claim**, the Limits Of Liability Aggregate shall be decreased by that portion of payments of **Damages** and **Claim Expenses** allocated to each **Insured**.

### C. Policy Aggregate Limit Of Liability

The limit of liability for all **Damages** and **Claim Expenses** for all **Claims** made against **Insureds** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Policy Aggregate Limit Of Liability shown in the Declarations. All obligations of the **Insurer** under this Policy shall cease after the Policy Aggregate Limit Of Liability has been paid by the **Insurer** for **Damages** or **Claim Expenses**.

## SECTION VIII – RETENTION

**A.** An **Insured** shall pay **Damages** and **Claim Expenses** up to the amount of the applicable Retention shown in the Declarations, for each **Claim** made against such **Insured** and reported in writing to the **Insurer** during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable. The **Insurer's** obligations under this Policy shall not commence until the applicable Retention has been satisfied by an **Insured's** payment of **Damages** or **Claim Expenses**. The Retention shall be the sole responsibility of the **Insured** and will remain uninsured. The **Insurer** shall pay all covered **Damages** and **Claim Expenses** incurred in each **Claim** that exceed the applicable Retention up to the applicable limit of insurance.

**B.** If multiple **Insureds** are implicated in a **Claim**, a single Retention shall apply. The single Retention that shall apply to such **Claim** is the largest applicable Retention shown in the Declarations.

## SECTION IX – MULTIPLE CLAIMS

**A.** All **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered a single **Claim** and each such single **Claim** shall be deemed to have been made on the earlier of the following:

   **1.** When the earliest **Claim** arising out of such **Wrongful Act** or **Interrelated Wrongful Acts** was first made; or

   **2.** When notice was provided concerning a **Wrongful Act** or **Interrelated Wrongful Acts** giving rise to such **Claim** under the Policy or any other policy;

   regardless of whether before the **Policy Period** or the term of any preceding policy.

**B.** Such single **Claim** shall be subject to one Limit Of Liability Each Claim and one Retention, even if involving multiple claimants, **Insureds** or proceedings.

## SECTION X – NOTICE OF CLAIM

**A.** As a condition precedent to the obligations of the **Insurer** under this Policy, an **Insured** shall give the **Insurer** written notice of a **Claim** made against the **Insured** as soon as practicable, but in no event later than either:

   **1.** The end of the **Policy Period** or Extended Reporting Period, if applicable; or

   **2.** 30 days after the end of the **Policy Period** or Extended Reporting Period, if applicable, as long as such **Claim** is first made within the final 30 days of the **Policy Period** or Extended Reporting Period, if applicable.

**B.** Written notice of a **Claim** shall be addressed to the **Insurer**.

**C.** A **Claim** shall be deemed reported at the time when the **Insurer** receives written notice.

**D.** The **Insured** shall provide the **Insurer** with copies of all documents received by the **Insured** concerning a **Claim**, including, but not limited to a summons, complaint, statement of claim or any other papers served in a civil litigation or arbitration. In addition, the **Insured** shall provide the **Insurer** with the following:

   **1.** The name of the claimant;

   **2.** The name of each **Insured** involved in the **Claim**;

   **3.** A detailed description of the **Wrongful Act** giving rise to the **Claim**;

   **4.** The **Damages** that may result from the **Claim**; and

   **5.** The circumstances by which the **Insured** became aware of the **Claim**.

## SECTION XI – NOTICE OF A WRONGFUL ACT

**A.** An **Insured** may provide the **Insurer** with written notice of a **Wrongful Act** committed during the **Policy Period** which reasonably may be expected to give rise to a **Claim** as soon as practicable after the **Wrongful Act** or **Interrelated Wrongful Act** becomes known to the **Insured** during the **Policy Period**. Such notice may not be provided after the **Policy Period** expires, nor during any Extended Reporting Period.

**B.** The **Insured** shall provide the **Insurer** with the following concerning any such **Wrongful Act**:

1. The name of the potential claimant;

2. The name of each **Insured** allegedly responsible for such **Wrongful Act**;

3. A detailed description of the fact, allegation, circumstance or situation that could result in a **Claim**;

4. The **Damages** that may result from the **Wrongful Act**;

5. The circumstances by which the **Insured** became aware of the **Wrongful Act**; and

6. The reasons for anticipating a **Claim**.

**C.** A **Claim** arising from a **Wrongful Act** and reported in accordance with Paragraphs **A.** and **B.** of Section **X** – Notice Of Claim shall be deemed to have been first made and reported when the **Insurer** receives written notice of the **Wrongful Act** or **Interrelated Wrongful Act**.

**D.** Such written notice of a **Wrongful Act** which reasonably may be expected to give rise to a **Claim** must be given to the **Insurer**.

## SECTION XII – ASSISTANCE AND COOPERATION

**A.** The **Insured** shall cooperate with the **Insurer** and provide such assistance and information as the **Insurer** may reasonably request, including submission to an examination and interrogation by a representative of the **Insurer**, under oath if required. The **Insured** shall assist with the defense of a **Claim** and shall attend hearings, depositions, trials and otherwise assist in the conduct of suits, including but not limited to effecting settlement, securing evidence and giving evidence, obtaining the attendance of witnesses, and giving written statements to the **Insurer's** representatives.

**B.** The **Insured** shall not take any action which may increase exposure or **Damages**. The **Insured** shall not admit liability, agree to settlement, mediation or arbitration of any **Claim** or incur any cost or expense without the written consent of the **Insurer**, which shall not be unreasonably withheld.

**C.** If any **Insured** shall commit fraud in reporting any **Claim**, the insurance provided by this Policy shall be void from the date such fraudulent **Claim** is reported to the **Insurer**.

## SECTION XIII – EXTENDED REPORTING PERIODS

**A. Group Extended Reporting Period**

In the event of cancellation or non-renewal of this Policy by the **Insurer**, the **Insureds** shall have a period of 60 days after expiration of the **Policy Period** to report to the **Insurer** any **Claims** first made during the **Policy Period** which arise from **Wrongful Acts** occurring on or after the **Retroactive Date** but before the end of the **Policy Period**. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

1. Notwithstanding any of the provisions of this Policy, the Extended Reporting Period provided herein shall not apply if an **Insured** has other insurance that applies to a **Claim** in whole or in part.

2. The Extended Reporting Period provided herein shall not apply if the **Broker/Dealer** terminates the Policy as provided for in Section **XIV** – Termination Of Coverage or decides not to renew this Policy.

3. The Extended Reporting Period provided herein shall not apply if the **Insurer** cancels or rescinds this Policy because of the failure to pay a premium or other amounts when due, or because of a fraud or misrepresentation.

4. The Extended Reporting Period provided herein shall not reinstate, increase or affect the applicable limits of liability nor extend the **Policy Period**.

5. The Extended Reporting Period provided herein shall include and not be in addition to the Extended Reporting Periods provided by Paragraph **B.** below.

**B. Individual Extended Reporting Period**

Upon termination of a **Registered Representative's** coverage under this Policy for the reason stated in Section **XIV** – Termination Of Coverage, Paragraph **A.3.** below, or if a **Registered Representative** retires from the business of rendering **Professional Services**, becomes disabled or dies, such **Registered Representative** or his or her legal representative in the event of death, shall have an Extended Reporting Period of 60 days commencing on the date of the **Registered Representative's** termination, retirement, disability or death during which to report **Claims** first made during the **Policy Period** which arise from **Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Registered Representative's** termination, retirement, disability or death. A **Claim** reported under this Extended

Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

**1.** Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if a **Registered Representative** has other insurance that applies to a **Claim** in whole or in part.

**2.** The Extended Reporting Period provided herein shall not apply if the **Broker/Dealer** terminates the **Registered Representative's** contract because of a failure to comply with the **Broker/Dealer's** rules, requirements or guidelines governing the conduct, business or activities of **Registered Representatives**.

**3.** The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable limits of liability nor extend the **Policy Period**.

**4.** A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Policy Period**.

## SECTION XIV – TERMINATION OF COVERAGE

**A.** The coverage afforded by this Policy shall terminate upon the earlier of:

**1.** The expiration date of the **Policy Period** stated in the Declarations;

**2.** Cancellation as provided by Paragraph **B.**, **C.** or **D.** below; or

**3.** As to a **Registered Representative**, the termination of his or her contract with the **Broker/Dealer** to render **Professional Services**.

**B.** This Policy may be terminated by the **Insurer**, for other than failure to pay a premium when due, by providing written notice to the **Broker/Dealer** at the address shown in the Declarations with the effective date of termination being not less than 60 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice. If the **Insurer** terminates the Policy, the **Broker/Dealer** shall receive a return of premium to be computed on a short rate basis proportional to the length of time from the inception date of the **Policy Period** to the termination date.

**C.** This Policy may be cancelled by the **Insurer** because of failure to pay a premium when due by providing written notice to the **Broker/Dealer** at the address shown in the Declarations with the effective date of termination being not less than 10 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice.

**D.** The **Broker/Dealer** may terminate the Policy by written notice to the **Insurer** at the address shown in the Declarations with the effective date of termination being not less than 30 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice. If the **Broker/Dealer** terminates the Policy, the **Insurer** shall be deemed to have fully earned the premium for this Policy.

**E.** Nothing contained herein shall limit, abrogate or negate the rights of the **Insurer** under law and equity to declare that the Policy is void based on material misrepresentations or omissions contained in the **Application**.

## SECTION XV – OTHER INSURANCE

**A.** If any **Insured** has other insurance for a **Claim** made and reported during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, then this Policy shall be excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**B.** The foregoing shall not apply if such other insurance is specifically intended to be excess over the coverage afforded by this Policy.

**C.** If a **Claim** is covered by this Policy and another policy issued by the **Insurer** or any company or entity affiliated with the **Insurer**, regardless of the **Insured** included in a **Claim**, then a single limit of liability and single Retention shall apply under both policies to the **Claim**. The single limit of liability applicable to the **Claim** shall be the largest such limit of liability under the policies. The Retention applicable to the **Claim** shall likewise be the largest under the policies.

## SECTION XVI – SUBROGATION

**A.** In the event that the **Insurer** pays **Damages** or **Claim Expenses** under this **Policy** on behalf of any **Insured**, the **Insurer** shall be subrogated to all of the **Insured's** rights of recovery, contribution, indemnification and apportionment against any third party implicated in a **Claim**. The **Insured** shall do nothing before or after the **Insurer's** payment of **Damages** or **Claim Expenses** that would waive, prejudice or impair the **Insurer's** subrogated rights of recovery, contribution, indemnification or apportionment.

B.   The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of recovery, contribution, indemnification or apportionment which the **Insured** may have, including the execution of such documents as are necessary to enable the **Insurer** to commence proceedings in any **Insured's** name. The **Insured** shall provide all other assistance and cooperation which the **Insurer** may reasonably require.

## SECTION XVII – OTHER PROVISIONS

**A.   Entire Agreement**

The terms and provisions of this Policy shall not be waived, changed or modified, unless by endorsement. Notices to, by or from any agent, representative or servant of any **Insured** or the **Insurer** shall not affect a waiver, change or modification of the Policy and shall not prevent the **Insurer** from asserting any rights under the Policy.

**B.   Assignment**

This Policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

**C.   Authorization**

By acceptance of this Policy, the **Broker/Dealer** agrees to act on behalf of the **Insureds** for all purposes including, but not limited to, the negotiation of the terms of the Policy, payment of or return of premiums, receipt and acceptance of any endorsement issued to form a part of the Policy and giving and receiving notice of cancellation, termination or non-renewal of the Policy.

**D.   Action Against The Insurer**

1.   No action shall be taken against the **Insurer** unless, as a condition precedent thereto, an **Insured** has fully complied with all the terms and provisions of this Policy. In addition, no action shall be taken against the **Insurer** until the amount of an **Insured's** obligation or liability to a third party has been finally determined by an award or judgment against an **Insured** in an actual adjudicatory proceeding.

2.   No person, organization or entity shall have the right under this Policy to join any **Insured** in any action or proceeding against an **Insurer** to determine the **Insurer's** liability nor shall the **Insurer** be impleaded in an action or proceeding by any **Insured** or applicable legal representative.

**E.   Bankruptcy**

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the **Insurer** of any of its obligations hereunder.

**F.   Conformance To Statute**

Terms of this Policy which are in conflict with the statutes of the State wherein this Policy is issued are hereby amended to conform to such statutes.

**G.   Headings**

The descriptions in the headings and any subheading of this Policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NON-STACKING ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that if any claim under this policy is also covered by one or more other policies issued by the **Insurer**, or by any other member of Markel Corporation, to the person or entity named in the Declarations or to any person who controls, is controlled by or is under common control with, said person or entity, then with respect to such claim:

1. The **Insurer** shall not be liable under this policy for a greater proportion of the loss than the applicable Limit of Liability under this policy bears to the total applicable Limits of Liability of all such policies, and
2. The maximum amount payable under all such policies shall not exceed the Limit of Liability of that policy referred to above which has the highest applicable Limit of Liability.

Nothing contained in this endorsement shall be construed to increase the Limit of Liability of this policy.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL**®

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SUPERVISION LIABILITY

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is understood and agreed as follows:

I.  Section I, INSURING AGREEMENTS, is amended to include the following:

The **Insurer** shall also pay on behalf of the **Broker/Dealer Damages** of the **Broker/Dealer** for which it becomes legally obligated to pay because of a **Claim** first made against the **Broker/Dealer**, with or without a **Registered Representative**, and reported in writing to the **Insurer** during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or during an Extended Reporting Period, if applicable, for any actual or alleged **Supervision Liability** of the **Broker/Dealer** arising out of a **Wrongful Act** or **Interrelated Wrongful Act** of a registered representative who is not enrolled for coverage under the Policy in the performance or failure to perform **Professional Services**. In no event shall coverage provided by the Policy apply to a registered representative who is not enrolled for coverage thereunder.

II.  Section V, DEFINITIONS, is amended to include the following:

**Supervision Liability** means liability of the **Broker/Dealer** arising out of, based upon or attributable to a **Wrongful Act** or **Interrelated Wrongful Act** of a registered representative who is not enrolled for coverage under the Policy. **Supervision liability** shall not include liability for any **Wrongful Act** or **Interrelated Wrongful Acts** of the **Broker/Dealer**, however, this exception shall not apply and supervision liability shall include supervision and due diligence services.

III.  Section XV, OTHER INSURANCE, is amended to include the following:

Coverage provided by the foregoing Insuring Agreement shall apply only as excess over any other valid or collectible insurance available to the **Broker/Dealer**.

All other terms and conditions remain unchanged.

**MARKEL**®

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITED SELLING AWAY COVERAGE

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

### SCHEDULE

| | |
|---|---|
| Limit Of Liability: | $1,000,000 Each Selling Away Claim |
| Limit Of Liability: | $1,000,000 Selling Away Aggregate |
| Retention: | $100,000 Each Selling Away Claim |

**A.** For the purpose of this Endorsement, Paragraph **R.** of Section **IV** – Definitions is replaced by the following:

**Wrongful Act** means a negligent act or omission, including a **Personal Injury Act**, committed by an **Insured** in the rendering of or failing to render **Professional Services** to a client, including the failure of the **Broker/Dealer** to supervise its **Registered Representatives** with respect to **Selling Away** activities, but only if the **Broker/Dealer** did not have knowledge of this activity prior to the policy inception date and did not acquiesce in this activity after its discovery and subsequent to the policy inception date.

**Wrongful Act** does not mean the **Selling Away** activity of a **Registered Representative**.

**B.** For the purpose of this Endorsement, Section **IV** – Definitions -- is amended to include the following:

**Selling Away** means the sale, attempted sale or servicing of any **Securities** which are not approved or authorized by and actually processed through the **Broker/Dealer**.

**C.** For the purpose of this Endorsement, Paragraph **Q.** of Section **V** – Exclusions -- does not apply to a **Wrongful Act** of the **Broker/Dealer** in failing to supervise its **Registered Representative** with respect to **Selling Away** activities. Said exclusion, however, shall continue to apply to **Claims** against **Registered Representatives**.

**D.** For the purpose of this Endorsement, the following is added to Section **VII** – Limits Of Liability:

Subject to the Limit Of Liability Each Claim, Limit Of Liability Aggregate, and Policy Aggregate Limit Of Liability, the:

**1.** Limit Of Liability Each Selling Away Claim shown in the Schedule of this Endorsement is the limit of the **Insurer's** liability for each **Selling Away Claim** made against the **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable;

**2.** Limit Of Liability Selling Away Aggregate shown in the Schedule of this Endorsement is the limit of the **Insurer's** liability for the sum of all **Damages** and **Claim Expenses** for all **Selling Away Claims** made against the **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable.

**3.** The Selling Away Limits Of Liability, as shown in the Schedule of this Endorsement shall be part of, and not in addition to **Broker/Dealer** Limit Of Liability and Policy Aggregate Limit Of Liability shown on the Declarations.

4. In the event that a **Claim** implicates both the Selling Away Limits Of Liability stated in this Endorsement and the **Broker/Dealer** Limits Of Liability per **Claim** stated in the Declarations, then the lower Limits Of Liability shall apply to such **Claim**.

E. For the purpose of this Endorsement, the following is added to Section **VIII** – Retention:

The **Broker/Dealer** shall pay **Damages** and **Claim Expenses** up to the amount of the applicable Selling Away Retention shown in the Schedule of this Endorsement, for each **Selling Away Claim** made against such **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable. The **Insurer's** obligations under this Policy shall not commence until the applicable Selling Away Retention has been satisfied by the **Broker/Dealer's** payment of **Damages** or **Claim Expenses**. The Selling Away Retention shall be the sole responsibility of the **Broker/Dealer** and will remain uninsured. The **Insurer** shall pay all covered **Damages** and **Claim Expenses** incurred in each **Selling Away Claim** that exceed the applicable Selling Away Retention up to the applicable limit of liability.

In the event that a **Claim** implicates both the Selling Away Retention stated in this Endorsement and the **Broker/Dealer** Retention stated in the Declarations, then larger Retention shall apply to such **Claim**.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SPECIFIC PRODUCT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

### SCHEDULE

| Product(s): | Promissory Notes; |
| --- | --- |
| | Viatical Settlements; |
| | ATMs/ETS payphones; |
| | Callable CD's; |
| | Debentures; |
| | Medical Capital Note Programs; |
| | Desert Capital REIT; |
| | Provident Royalties; |
| | DBSI Management Products; |
| | Black Diamond Program; |
| | Shale Royalties; |
| | IMH Secured Loan, LLC; |
| | Geneva Exchange LLC/The Geneva Org.; |

Section **V** – Exclusions is amended to include the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the purchase, sale or the giving of advice regarding any Product(s) shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

**Endorsement #4**                                                                                              **Page 1 of 1**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NEW YORK AMENDMENTS

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

Solely with respect to any **Insureds** that are domiciled or have a primary place of business in the state of New York, it is hereby understood and agreed that:

1.  The **Registered Representative** Aggregate Limit of the Declaration is deleted in its entirety.

2.  Sections X (NOTICE OF CLAIM) and XI (NOTICE OF A WRONGFUL ACT) are replaced by the following:

    This is a Claims Made Policy.  This Policy covers only those **Claims** first made against the **Insured** during the **Policy Period** or sixty (60) day automatic Extended Reporting Period or Optional Extended Reporting Period, if purchased.

    All notices to the **Insurer** shall refer to the Policy Number and shall be given in writing and sent by mail, prepaid express courier or by facsimile, to the address listed in the Declarations and shall be effective upon receipt.

    (a)   The **Broker/Dealer** or any other **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer** at the address or  facsimile number listed in the Declarations of a **Claim** made against the **Insured** as soon as practicable after the **Broker/Dealer's** risk manager or general counsel (or equivalent position) first becomes aware of the **Claim**, but in all events no later than sixty (60) days after the end of the **Policy Period** or the extended Reporting Period (if applicable).

    (b)   If during the **Policy Period,** or within sixty (60) days following the expiration of the Policy, The **Broker/Dealer** or any other **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the anticipated allegations of **Wrongful Act(s)** and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against such **Insured** and reported to the Insurer for a **Wrongful Act**.

        (1)   which is the same as any **Wrongful Act** alleged or contained in such notice, or

        (2)   which together with any **Wrongful Act** alleged or contained in such notice constitute **Interrelated Wrongful Acts**,

    Shall be considered made at the time such notice of circumstances was first give to the **Insurer**.  However, the **Insurer** shall not be liable under this Policy for any amount incurred by an **Insured** in the defense, investigation or settlement of any such potential claim prior to the date the **Claim** is actually made against the **Insured**.

    Notwithstanding anything to the contrary in the Declarations or Policy, notice of any **Claim** may also be provided to any authorized agent of the Insurer located within the State of New York.
    Failure to give  any notice required by this Policy within the time prescribed shall not invalidate any **Claim** made by the **Insured** if it shall be shown not to have been reasonably possible for the **Insured** to give such notice within the prescribed time and that notice was given as soon as was reasonably possible.

**Endorsement #5**

**Page 1 of 6**

3.   Section XIII (EXTENDED REPORTING PERIODS) is replaced by the following:

A.  Group Extended Reporting Periods

1.  Automatic Extended Reporting Period:  The **Insured** shall have a period of sixty (60) days  after  the expiration of the **Policy Period** to report in writing to the Insurer any **Claim** which is first made during said sixty (60) day period, and arises out of a **Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period.**

This Automatic Extended Reporting Period shall not be available if the **Insured** has any other applicable insurance, including any policy issued subsequently to this Policy. This Automatic Extended Reporting Period shall be  included within the Optional Extended Reporting Period described in paragraph A.2 below, if such is purchased.

2.  Optional Extended Reporting Period: In the event of **Coverage Termination**, the **Broker/Dealer** acting ng on behalf of all **Insureds** shall have  the right to purchase an Optional Extended Reporting Period upon payment of an additional premium equal to 200% of the total annual premium which is the sum of the original annualized premium and the fully annualized amount of any additional premiums charged by the **Insurer** during the **Policy Period**.  Pursuant to such Optional Extended Reporting Period, the **Insured** shall have a period of three (3) years from the effective date of such **Termination of Coverage** to give written notice to the Insurer of a **Claim** which is first made during such three (3) year period and which arises out of a **Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**.  The rights contained in this section shall terminate unless written notice of such election together with the additional premium due is received by the Insurer within thirty (30) days after the effective date of **Coverage Termination**.

3.  The **Insurer** shall notify the **Broker/Dealer** within thirty (30) days of the date of **Coverage Termination** of the premium for and provisions of the Optional Extended Reporting Periods unless the Insurer cancels for nonpayment of premium or fraudulent activities of an **Insured** and the policy has been in effect for less than one (1) year.

If the Insurer cancels this Policy because the **Broker/Dealer** failed to pay a premium when    due   or fraudulent activities of an **Insured**, the **Insurer** will only provide  a premium quotation for the Optional Extended Reporting Period upon request.

B.  Individual Registered Representative Extended Reporting Periods

1.  Automatic Registered Representative Extended Reporting Period. If  during the **Policy Period,** the contract between a **Registered Representative** and the **Broker/Dealer** (hereinafter, the "Contract") is terminated, the insurance under this Policy shall cease as of the date of the termination of the Contact as to such **Registered Representative** and **Insureds** defined in Sections IV. F 2 and 3.  In such event, the **Registered Representative** shall have a period of ninety (90) days after the date of termination of the Contract to give written notice to the Insurer of any **Claim** which is first made during said ninety (90) day period, and arises out of a **Wrongful Act** committed on or after the **Retroactive Date** and before the date of termination of the Contract.

2.  Automatic Extended Reporting Period Due  to Disablement, Retirement, or Death. If  a **Registered Representative** becomes disabled, retires from the  business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Broker/Dealer** or dies, the **Registered Representative** or the legal representative of a deceased **Registered Representative**, shall be entitled to a period of two (2) years after the date of termination of the Contract by reason of disablement retirement or death to give written notice to the **Insurer** of any **Claim** which is first made during said two (2) year period and arises out of a **Wrongful Act** committed on or after the **Retroactive Date** and before the date of termination of the Contract due to disablement, retirement or death. The **Insured** shall not be entitled to any of the Automatic Extended Reporting Periods described in paragraphs A. 1. and B. 1 and 2.  if the **Insured** has any valid and collectible insurance which applies to any **Loss and Defense Costs**.

3.      Registered Representative Optional Extended Reporting Periods

    a.    A **Registered Representative** who becomes disabled or retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Broker/Dealer** or the legal representative of a deceased **Registered Representative** may elect to purchase an Extended Reporting Period for **Claims** which are first made against a **Registered Representative** and reporting in writing to the **Insurer** within:

        (i)    three (3) years of the date of termination of the Contract**,** if a **Registered Representative** or the legal representative of the decease **Registered Representative** pays an additional premium equal to 200% of a **Registered Representative's** last annual premium within sixty (60) days of the date of termination of the contract; or

        (ii)    five (5) years of the date of termination of the Contract, if a **Registered Representative** or the legal representative of a deceased **Registered Representative** pays an additional premium equal to 300% of the **Registered Representative**'s last annual premium within sixty (60) days of the date of termination of the Contract; or

        (iii)   an unlimited amount of time after the date of termination of the Contract, if the **Registered Representative** or the legal representative of the deceased **Registered Representative** pays an additional premium equal to 400% of the **Registered Representative's** last annual premium within sixty (60) days of the date of termination of the Contract.

C.      These Optional Extended Reporting Periods shall be in addition to any Automatic Extended Reporting Periods described in XII A. and B. above.

D.      A separate aggregate Limit of Liability equal to the limit specified on the Declarations and any endorsement thereto shall apply to any **Claim** or **Claims** reported during the Optional Extended Reporting Period.

E.      **Claims** which are properly reported during an Extended Reporting Period will be deemed to have been made on the last day of the **Policy Period**.

F.      As used in this section, **Coverage Termination** is defined as follows:

    1.    any cancellation or nonrenewal of the Policy, whether by the **Insurer** or **Broker/Dealer**; or

    2.    decrease in Limits of Liability, reduction of coverage, increased Retention, new exclusion, or any other change in coverage less favorable to the **Insureds**.

4.    Sections XIV.B, C, D and E (TERMINATION OF COVERAGE) are replaced with the following:

    If this Policy has been in effect for sixty (60) days or less, and is not a renewal of a Policy previously issued by the **Insurer**, this Policy may be cancelled by or on behalf of the **Insurer** by mailing or delivering to the **Broker/Dealer's** authorized agent or broker and to the **Broker/Dealer** at the address shown in Item __ of the Declarations written notice of cancellation stating the reason for cancellation at least twenty (20) days before the effective date of cancellation.

    After this Policy has been in effect for more than sixty (60) days or after the effective date of renewal, this Policy may only be cancelled by or on behalf of the **Insurer** for one of the following reasons.

    1)    non payment of premium;

    2)    conviction of a crime arising out of acts increasing the hazard insured against;

    3)    discovery of fraud or material misrepresentation in obtaining the Policy or in the presentation of a **Claim** thereunder;

4) after issuance of this Policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period**;

5) a determination by the Superintendent that continuation of the present premium volume of the **Insurer** would jeopardize the Insurer's solvency or be hazardous to the interests of policyholders of the Insurer, its creditors or the public; or

6) a determination by the Superintendent that the continuation of the Policy would violate, or would place the **Insurer** in violation of New York Law.

Cancellation shall be effect by mailing or delivering to the **Broker/Dealer's** authorized agent or broker and to the **Broker/Dealer** at the address shown in Item __ of the Declarations written notice of cancellation specifying the grounds for cancellation at least fifteen (15) days befor the effective date of cancellation.

5. SECTION XIV (TERMINATION OF COVERAGE) is further amended by the addition of the following:

Should the **Insurer** decide to nonrenew this Policy or conditions its renewal upon a change in the Limits of Liability, change in type of coverage, reduction of coverage, increased Retention, addition of any exclusion or an increase in premium in excess of 10%, then the **Insurer** shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Broker/Dealer** at the principal address shown in Item __ of the Declarations and to the **Broker/Dealer's** authorized agent or broker, if applicable, at least sixty (60) days but not more than one hundred and twenty (120) days before the end of the **Policy Period**. Such notice shall contain the specific reasons for the nonrenewal or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the **Insurer** does not provide notice of nonrenewal or conditional renewal as provided in Section XIV coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior **Policy Period's** rate until sixty (60) days after such notice is mailed or delivered unless the **Broker/Dealer**, during this sixty (60) day period, has replaced the coverage or elects to cancel in which event such cancellation shall be on pro rata premium basis; provided, however, that if the **Broker/Dealer** elects to renew on the basis of the conditional renewal notice, then such terms, conditions and rates shall govern the Policy upon expiration of such sixty (60) day period unless such notice was provided at least thirty (30) days prior to the expiration date of the Policy, in which event the terms, conditions and rates set forth in the conditional renewal notice shall apply as of the renewal date.

If the **Insurer** provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another **Policy Period**, at the lower of the current rates or the prior **Policy Period's** rates, unless the during the additional **Policy Period**, has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rate premium basis.

The **Insurer** will not send the **Broker/Dealer** notice of nonrenewal or conditional renewal if the **Broker/Dealer**, its authorized agent or another insurer of the **Broker/Dealer** mails or delivers notice that the Policy has been replace or is no longer desired.

If the **Broker/Dealer** elects to accept the terms, conditions and rates of the conditional renewal notice pursuant to Section XIV, a new Aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

6. Section XV (OTHER INSURANCE) is replaced by the following:

This insurance is excess over any other valid and collective insurance whether such insurance is primary, excess, contingent, or otherwise and whether such insurance is collectible or not; unless such other insurance is written to be specifically excess over the insurance provided by this Policy.

7. Section XVII.D (OTHER PROVISIONS – NO ACTION AGAINST THE INSURER) is replaced by the following:

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured's** or the written agreement of the **Insured,** the claimant and the **Insurer**.

8.   The following is added to Section XVII (OTHER PROVISIONS):

Transfer of Duties When a Limit of Insurance is Used Up

1.   If the **Insurer** concludes that, based on incidents, occurrences, offenses, **Claims** which have been reported to the **Insurer** and to which this insurance may apply, that any Limit of Liability (each **Claim**, Aggregate, or other) under the Policy is likely to be used up in the payment of judgments or settlements, the **Insurer** will notify the **Broker/Dealer**, in writing, to that effect.

2.   When a limit of Liability described above has actually been used upon in the payment of judgment or settlements:

(a)   The Insurer will notify the **Broker/Dealer**, in writing, as soon as practicable, that:

(i)    such Limit of Liability has actually been used up, and

(ii)   the **Insurer's** duty to defend **Claims** seeking **Damages** subject to that Limit of Liability has ended.

(b)   The **Insurer** will initiate, and cooperate in, the transfer of control, to any appropriate **Insured**, and all **Claims** seeking **Damages** which are subject to that Limit of Liability and which are reported to the **Insurer** before that limit is used up.   The **Insured** must cooperate in the transfer of control of said **Claims** and suits.

The **Insurer** agrees to take such steps, as the **Insurer** deems appropriate, to avoid a default   in,   or continue the defense of, such **Claims** until such transfer is completed, provided the appropriate **Insured** is cooperating in completing such transfer.   The **Insurer** has no obligation to take any action whatsoever with respect to any **Claim** that would have been subject to that Limit of Liability, had it not been used up, if the **Claim** is reported to the **Insurer** after that Limit of Liability has been used up.

(c)   The **Broker/Dealer** and any other **Insured** involved in a **Claim** suit seeking **Damages** subject to that Limit of Liability, must arrange for the defense of such suit within such time period as agreed to between the appropriate **Insured** and the **Insurer**.   Absent any such agreement, arrangements for the defense of such suit must be made as soon as practicable.

3.   The **Broker/Dealer** will reimburse the **Insurer** for expenses the **Insurer** incurs in take in  those steps the **Insurer** deems appropriate in accordance with paragraph 2.b. above.

The duty of the **Broker/Dealer** will reimburse the Insurer will begin on:

(a)   the date on which the applicable Limit of Liability is used up, if the Insurer sent notice in accordance with paragraph 1, above; or

(b)   the date on which the **Insurer** sent notice in accordance with paragraph 2.a. above, if the **Insurer** did not send notice in accordance with paragraph 1. above.

4.   The exhaustion on any Limit of Liability by the payments of judgments or settlements, and             the resulting end of the Insurer's duty to defend, will not be affected by the Insurer's failure to comply with any of the provisions of this condition.

9.   The following is added to Section XVII (OTHER PROVISIONS):

Notwithstanding anything to the contrary in this Policy, the insurance coverage afforded by this Policy as respects operations in New York State shall conform to the requirements of the applicable New York State Insurance Laws and the applicable New York State Insurance Department Regulations.

This Policy contains all agreements between the **Broker/Dealer** and the **Insurer** concerning the insurance afforded.   The **Broker/Dealer** shown in the Declarations is authorized to make changes in the terms of this Policy, but only with the consent of the **Insurer**.   The terms of the Policy can be amended or waived  only by endorsement issued by the **Broker/Dealer** and made a part of the policy.  Knowledge of a licensed agent of the **Insurer** shall be  acknowledged to the **Insurer** and any fact which breaches a condition of the Policy, and is known to the **Insurer's** agent shall not void the Policy and defeat a recovery thereon in the event of **Damages**.

Any **Retroactive Date** may not be changes during the term of this Policy or during the term of any Extended Reporting Period.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL**®

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SOCIAL ENGINEERING CLAIM COVERAGE

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

This endorsement modifies insurance provided under the following:

BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE POLICY

### SCHEDULE

| | |
|---|---|
| Social Engineering Claim Limits Of Liability: | $250,000 Each Claim |
| | $250,000 Insured Aggregate |
| | $2,000,000 Coverage Aggregate |
| Social Engineering Claim Deductible: | $5,000 |

**A.** The following is added to Section **I** – Insuring Agreements:

**Social Engineering Claim**

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Social Engineering Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **X** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

**1.** Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period**; and

**2.** As of the inception date of this Policy as shown in the Master Policy Declarations, or the effective date of the **Insured's** enrollment for coverage hereunder as shown in the Certificate Of Insurance, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Social Engineering Claim**.

**B.** For the purpose of this endorsement, the following definitions are added to Section **IV** – Definitions:

**Deceptive Communication** means an electronic, facsimile or written document or telephone contact received by an **Insured** from a third-party which:

**1.** directly relates to a life insurance or other product referenced in the Definition **IV.L** (**Professional Services**) that is serviced by an **Insured** on behalf of a client and in which a third party has no legal right or interest;

**2.** contains a misrepresentation of material fact concerning a client of an **Insured**, which is reasonably relied upon by an **Insured** in believing that the document or contact is from his or her client or the client's authorized representative; and

**3.** requests the withdrawal, surrender or transfer of fund held in the client's life insurance or other product referenced in the Definition **IV.L** (**Professional Services**).

**Social Engineering Claim** means a **Claim** arising from a third party misleading an **Insured** through a **Deceptive Communication**, which is reasonably relied upon by an **Insured** as genuine and results in an **Unauthorized Transfer**.

**Unauthorized Transfer** means theft, conversion or misappropriation of funds held in a client's life insurance or other products referenced in the Definition **IV.L** (**Professional Services**) by a third party solely because of such party's **Deceptive Communication** with an **Insured** and without knowledge of and actual or implied consent by a client.

**C.** For the purposes of this endorsement, the following are added to Section **V** – Exclusions:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Social Engineering Claim**:

**1.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged:

  **a.** Costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

  **b.** Costs or expenses incurred by any **Insured** or others:

  **(1)** To recall, repair, withdraw, replace, upgrade, supplement or remove the **Insured's** online content, products or services from the marketplace, including but not limited to products or services which incorporate the **Insured's** online content, products or services; or

  **(2)** For any loss of use by any **Insured** or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplement or removal;

  **c.** Fine or penalty arising out of any agreement by any **Insured** to comply with or follow the PCI Standard or any Payment Card Company rules, or to implement, maintain or comply with any security measure(s) or standards related to any payment card data; or

  **d.** Unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, pop-up or pop-under Internet advertising or fax-blasting, direct mailing or telemarketing, or actual or alleged violations of the Telephone Consumer Protection Act of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statute, law or regulation relating to a person's right to seclusion; or

  **e.** Unauthorized or illegal collection of any data or information, including but not limited to the collection of any data or information using cookies, spyware, or other malicious code, or the failure to provide adequate notice that data or information is being collected.

**2.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any Section 605 (requirements relating to information contained in consumer reports) or Section 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

**3.** Covered in whole or in part under any other insurance.

**D.** For purposes of this endorsement, the following is added to Section **VII** – Limits Of Liability:

**Social Engineering Claim Limits Of Liability**

The **Social Engineering Claim** Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VII** – Limits Of Liability.

Subject to the **Social Engineering Claim** Limits Of Liability Aggregate and Coverage Aggregate, the limit of the **Insurer's** liability for **Damages** and **Claim Expenses** incurred in each **Social Engineering Claim** reported by an **Insured** to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **X** – Notice of Claim, or Extended Reporting Period, if applicable, shall not exceed the **Social Engineering Claim** Limit Of Liability Each Claim shown in the Schedule of the endorsement. The inclusion of multiple **Insureds** or clients in **Interrelated Wrongful Acts** shall not increase the **Social Engineering Claim** Limit Of Liability Each Claim shown in the Schedule of this endorsement.

The Limit Of Liability for all **Damages** and **Claim Expenses** incurred in all **Social Engineering Claims** submitted by an **Insured** in writing during the **Certificate Period** shall not exceed the **Social Engineering Claim** Limit Of Liability Aggregate shown in the Schedule of this endorsement.

The **Social Engineering Claim** Limit Of Liability Each Claim and **Social Engineering Claim** Limit Of Liability Agent Aggregate are part of, subject to and do not increase the **Social Engineering Claim** Limit Of Liability Coverage Aggregate as shown in the Schedule of this endorsement.

The **Insurer's** obligations under this Policy, including the duty to defend, shall cease after the applicable **Social Engineering Claim** Limits Of Liability has been paid by the **Insurer** for all **Damages** and/or **Claim Expenses**.

The **Social Engineering Claim** Limits Of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits Of Liability shown in the Certificate Of Insurance.

E.   The following is added to Section **VIII** – Retention:

The **Social Engineering Claim** Deductible shown in the Schedule of this endorsement applies to **Damages** and **Claim Expenses** incurred in each **Social Engineering Claim** or **Social Engineering Claim** arising from **Interrelated Wrongful Acts**.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

It is agreed that SECTION IV – DEFINITIONS, F., Insured, is amended to include the following:

| INSURED | RETROACTIVE DATE |
|---|---|
| The Leaders Group (Life Agent) | July 1, 1996 |
| The Leaders Group (Broker/Dealer) | October 1, 2001 |
| TLG Advisors, Inc. | October 1, 2001 |
| LFI Advisory, Inc. | April 1, 2017 |

It is further agreed that with respect to the **Insured Broker/Dealers** listed above, coverage shall not apply to any actual or alleged **Wrongful Acts** occurring prior to the corresponding retroactive date set forth above.

All other terms and conditions remain unchanged.

**Endorsement #7**                                                                                       **Page 1 of 1**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENTS TO DEFINITION OF CLAIM AND EXCLUSION B.3 ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, the Policy is amended as follows:

I.   Section IV.C., DEFINITION OF CLAIM, Subsection 3, is amended to include the following:

Any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency, including, but not limited to, any disciplinary proceedings by such official or agency, except if: (i) the agency or official is a client of the **Broker/Dealer** in connection with the rendering of **Professional Services** and the proceeding by the agency or official is instigated and continued totally independent of, and totally with the solicitation, participation or intervention of any **Insured**; or (ii) if the agency or official commences a proceeding in the name of a group or collection of clients of an **Insured**.

II.   Section V, EXCLUSION B.3, is deleted in its entirety and replaced with the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Claim**:

B.   against an **Insured** by or on behalf of any:

* * *

3.   any state or federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity ("Governmental Entity"), whether directly or indirectly, and whether brought in its capacity as trustee, liquidator, or assignee of the **Broker/Dealer**, or in any other capacity and whether brought in its own name or in the name of any other entity; however, this exclusion shall not apply to any **Claim** brought"

i.   solely in such Governmental Entity's capacity as a customer or client of the **Broker/Dealer** and instigated and continued totally independent of, and totally without the solicitation. Assistance, participation or intervention of, any **Insured**;

ii.   on behalf of, or in the name of a group of or collection of clients of an **Insured**.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADVISOR ASSOCIATES ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, is understood and agreed as follows:

I.   Section IV.F., DEFINITION OF INSURED, is amended to include **Advisor Associates**.

**Advisor Associates** are enrolled individuals registered as investment advisors with TLG Advisors or LFI Advisory and is on file with the **Broker/Dealer**.

II.  With respect to this endorsement and only as to a **Claim** against the foregoing Advisor Associates, Section IV.L, DEFINITION OF PROFESSIONAL SERVICES, is deleted in its entirety and replaced with the foregoing:

**Investment Advisory Services**.

It is understood and agreed that **Investment Advisory Services** includes insurance sales (fixed and/or variable).

All other terms and conditions remain unchanged.

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ALTERNATIVE PRODUCTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that the Limits of Liability set forth in the Declarations is amended to include the following:

With respect to all **Damages** from any **Claim** arising out of, based upon or attributable to, in whole or in part, or in any way relating to the purchase or sale of Alternative Products by any **Insured**, the aggregate limit of the **Insurer's** liability for all such **Damages** shall be $250,000 per Claim $500,000 policy aggregate (hereinafter called the Alternative Products Sublimit of Liability). This Alternative Products Sublimit of Liability shall be part of and not in addition to the Policy Aggregate of $10,000,000 stated on the Declarations.

As used herein, Alternative Products includes, but is not limited to any investment product not registered with the SEC (or equivalent international commission), any private placement, Regulation D offering, any non-traded Real Estate Investment Trust, Delaware Statutory Trust, 1031 Exchange, Tennant-In-Common (TIC) investment, any hedge fund or hedge fund of funds, promissory note, private equity investment, business development company, medical receivables, leases or royalty products. However, Alternative Products does not include Private Placement Variable Universal Life products (PPVUL).

All other terms and conditions remain unchanged.

**Endorsement #10**

**Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL**®

# EVANSTON  INSURANCE  COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED DEFINITION OF PROFESSIONAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, Section IV.L, DEFINITION OF PROFESSIONAL SERVICES, is amended to include the following:

6.  providing brokerage services for individual retirement accounts (IRAs), Keogh retirement plans, 401(a), 401(k), 403(b) and 457 plans, group or ordinary pension and/or profit sharing plans and employee benefit plans.

   **Professional Services** shall not include providing of brokerage services for the following:

   **a.**  Multiple Employer Welfare Arrangements or Voluntary Employee Beneficiary Associations, as defined by   the Employee Retirement Income Security Act of 1974 and any amendments thereto;

   or

   **b.**  Section 79, 83, 412, 419 Plans or any other plans developed to provide tax deductions and advantages    under the Internal Revenue Code, amendments thereto and any regulations promulgated thereunder.

All other terms and conditions remain unchanged.

**Endorsement #11**                                                                                                          **Page 1 of 1**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDED DEFINITION OF RETROACTIVE DATE

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, Section IV.L, DEFINITION OF RETROACTIVE DATE, is deleted in its entirety and replaced with the following:

**Retroactive Date** means:

1.  With respect to the **Broker/Dealer**, the date stated in the Declarations.

2.  **a.**  With respect to a **Registered Representative** or **Brokerage General Agency** for a **Claim** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the rendering of **Professional Services** as defined in Sections IV.L.1.a and IV.L.1.b. (i.e. the solicitation, sale or servicing of life insurance, accident and health insurance, disability income insurance, fixed annuities and variable products), the date of the **Registered Representative's** or **Brokerage General Agency's** first uninterrupted and continuously renewed registered representatives or insurance agents professional liability insurance, which was maintained through the inception date of the Policy, subject to provision of proof of such insurance to the **Insurer**.

    **b.**  With respect to a **Registered Representative** for a **Claim** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the rendering of all other **Professional Services** as defined in Sections IV.L., the date of the **Registered Representative's** first contract with another broker/dealer, but only if the **Wrongful Act** or **Interrelated Wrongful Acts** at issue in a **Claim** occurred on or after the date that the **Registered Representative** first obtained registered representatives professional liability insurance through such prior broker/dealer and maintained such insurance continuously and without interruption to the **Registered Representative's** date of first contracting with the **Broker/Dealer**, subject to provision of proof of such insurance to the **Insurer**.

    As to Section 2.b. above, it is further understood and agreed as follows:

    1.  the Policy does not provide coverage to any former broker/dealer with which a **Registered Representative** was contracted;

    2.  coverage as is afforded by virtue of this endorsement will not apply to any **Claim** that is covered, in whole or in part, by any other professional liability insurance policy issued by the **Insurer** or any its parent companies, subsidiaries, affiliates or member companies;.

    3.  the Policy does not apply to any **Claim** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving a **Claim** that was pending or prior to the date the **Registered Representative's** first contract with the **Broker/Dealer**, or arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving **Wrongful Acts**, **Interrelated Wrongful Acts** and/or the same or essentially the same facts and circumstances alleged in such pending or prior **Claim**; and

    4.  the Policy does not apply to any **Claim** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Wrongful Acts** or **Interrelated Wrongful Acts** which the **Registered Representative** knew or could have reasonable known would lead to a **Claim** as of his or her date of contract with the **Broker/Dealer**.

**Endorsement #12**                                                                                                    **Page 1 of 2**

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED INDIVIDUAL EXTENDED REPORTING PERIOD ENDORSEMENT

In consideration of the premium charged, it is agreed as follows:

I.    Section XIII.B of the Policy – Individual Extended Reporting Period -- is deleted and replaced with the following:

1.    Upon termination of a **Registered Representative's** coverage under this Policy for the reason stated in Section **XIV** – Termination Of Coverage, Paragraph **A.3.**,  such **Registered Representative** shall have  an Extended Reporting Period to the end of the **Policy Period** commencing on the date of the **Registered Representative's** termination, during which to report **Claims** first made during the **Policy Period** which arise from **Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Registered Representative's** termination. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.    Upon termination of a **Registered Representative's** coverage under this Policy for the reason stated in Section **XIV** – Termination Of Coverage, Paragraph **A.3.**, solely because of **Retirement**, **Disability** or death, such **Registered Representative**, or his or her estate or legal representative in the event of death, shall have  an Extended Reporting Period of unlimited commencing on the date of the **Registered Representative's Retirement**, **Disability** or death, during which to report **Claims** first made during the **Policy Period** or this Extended Reporting Period, which arise from **Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Registered Representative's Retirement**, **Disability** or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

Notwithstanding any other provision of this Policy, the Extended Reporting Periods provided in Subsections 1 and 2 above shall not apply:

(i)    if a **Registered Representative**, or his or her estate or legal representatives in  the event of death, has other insurance that applies to a **Claim**, in whole or in part; or

(ii)    if the **Broker/Dealer** terminated the **Registered Representative's** contract because of a failure to comply with the **Broker/Dealer's** rules, requirements or guidelines governing the conduct, business or activities of **Registered Representatives**, regardless of whether such termination occurred prior to **Retirement**, **Disability** or death.

The  Extended Reporting Periods provided in Subsections 1 and 2 above shall not reinstate, increase or otherwise affect the applicable limits of liability nor extend the **Policy Period**.

A **Claim** which is properly reported during this Extended Reporting Periods provided in Subsections 1 and 2 above shall be deemed to have been first made on the last day of the **Policy Period**.

The Extended Reporting Periods provided in Subsections 1 and 2 above  shall only apply if the **Insurer** continues coverage to the **Insureds** under a  renewal or replacement policy issued to the **Broker/Dealer** Policy Holder, which is designation in the Declarations, following expiration of the **Policy Period**. In the event that no such renewal or replacement policy is issued, the Extended Reporting Periods provided in Subsections 1 and 2 above shall end 30 days after expiration of the **Policy Period**.

**Endorsement #13**                                                                                                **Page 1 of 2**

II.   Section III. of the Policy -- DEFINITIONS -- is amended to include the following:

**Disability** means a physical or mental incapacity which prevents a **Registered Representative** from performing any **Professional Services**, or any other occupation, and for which a private disability insurance company is paying a **Registered Representative** monthly disability benefits.

**Retirement** means the formal withdrawal of a **Registered Representative** from the business of securities and insurance, in accordance with all of the requirements policies, rules and regulations of the **Broker/Dealer** provided that a **Registered Representative**:

(i)   is 55 years of age or older;

(ii)   has been under a contract with the **Broker/Dealer** for a continuous period of at least 5 years prior to his or her withdrawal of the business of securities and insurance; and

(iii)   does not perform **Professional Services** for any other broker/dealer, person, company or entity, nor engages in any business activities of any manner for any person, company or entity.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED GROUP EXTENDED REPORTING PERIOD ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, Section XIII.A, EXTENDED REPORTING PERIODS – Group Extended Reporting Period -- is deleted in its entirety and replaced with the following:

Except as stated below, if the **Insurer** or the **Broker/Dealer** shall cancel or refuse to renew this Policy, the **Broker/Dealer** shall have the right, upon payment of an additional premium of 150% of the **Broker/Dealer's** last annual premium, for an Extended Reporting Period of (1) year; or 200% of the **Broker/Dealer's** last annual premium, for an Extended Reporting Period of (3) years following the effective date of such cancellation or nonrenewal in which to give to the **Insurer** written notice of **Claims** first made against the Insureds during said period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this Policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election, together with the additional premium due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or non-renewal.

The additional premium for the Extended Reporting Period shall be fully earned at the inception of the Extended Reporting Period. The Extended Reporting Period is not cancelable. This Section and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The offer by the **Insurer** of renewal terms, conditions, Limits of Liability and/or premiums different from those of the expiring policy shall not constitute a refusal to renew.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED EXCLUSION K ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, its understood and agreed that the Policy is amended as follows:

I.   Section V, EXCLUSION K, is deleted in its entirety and replaced with the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Claim**:

K.   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any:  (i) employee benefit plan or trust sponsored by any **Insured** or sponsored by any business enterprise that is operated or managed or owned, directly or indirectly, in whole or in part, by any **Insured**; or (ii) any plan in which an Insured is a participant or is a "named fiduciary, as defined below; or  (iii)  arising out of, based upon or attributable to any services performed by any **Insured** acting in fact as a trustee or administrator under the Employee Retirement Income Security Act of 1974, or amendments thereto, or any similar federal or state statutory law or any regulation or order issued pursuant thereto;

provided, however, that the foregoing exclusion shall not apply to a **Claim** in which an **Insured** is either (i) deemed to be a fiduciary Advisor under the Pension Act of 2006 or any amendments thereto or (ii) is a fiduciary by recommending securities, as described in Section 3(21)(A)(ii) of ERISA.

The foregoing exclusion shall also not apply to a **Claim** in which an **Insured** is a registered investment advisor serves as an investment manager for a qualified plan pursuant to Section 3(38) of ERISA.

With respect to this exclusion, the phrase "named fiduciary" is defined as in Section 402(a)(2) of ERISA, which states:

A fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary:

(i)      by a person who is an employer or employee organization with respect to the plan; or

(ii)      By such employer and such an employee organization acting jointly.

II.  The RETENTION set forth in the Declarations is amended to include the following:

With respect to any Claim arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving an **Insured** who is a registered investment advisor who serves as an investment manager for a qualified plan pursuant to Section 3(38) of ERISA, the applicable Retention shall be:

**Registered Representative each Claim - $10,000**

**Broker/Dealer each Claim - $50,000**

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BGA ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, is understood and agreed as follows:

I.   Section IV.F., DEFINITION OF INSURED, is amended to include the following:

    **3.**    **Brokerage General Agency**.

II.   Section IV, DEFINITIONS, is amended to include the following:

**Brokerage General Agency** means an insurance agency that is listed as having purchased coverage under the Policy on a roster of insured **Brokerage General Agencies**, with such roster maintained on file by Arthur J. Gallagher and to be made available to the Insurer upon its request.

III.   Section VII, LIMITS OF LIABILITY, is amended to include the following:

A **Registered Representative** may purchase under the Policy the following Limits of Liability for his or her **Brokerage General Agency**: (i) $1,000,000 each **Claim**; or (ii) $2,000,000 each **Claim** ("the BGA Limit"). The applicable BGA Limit shall be the maximum limit of the **Insurer's** liability for all **Damages** and **Claim Expenses** arising out of all **Claims** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts**, of or in connection with such **Brokerage General Agency**, its officers, directors and employees and to any **Registered Representatives** who are contracted with such **Brokerage General Agency**.

All other terms and conditions remain unchanged.

**Endorsement #16**                                                          **Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL**®

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DISCRETIONARY AUTHORITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

**A.**  For the purposes of this Endorsement, Paragraph **S.** of Section **V** – Exclusions is deleted in its entirety and replaced with the following:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving an **Insured's** actual or alleged exercise of discretionary authority over a client's assets, funds or liabilities, undertaking of trades or transactions on a discretionary basis or any trading or transactions without the express authority of a client; however, this exclusion shall not apply to any **Insured** providing an **Investment Advisory Service**;

**B.**  **Investment Advisory Services** as used in this Endorsement, means giving financial, economic or investment advice regarding investments in securities and/or rendering investment management services pursuant to a written contract defining the scope of such advice and/or services and the compensation to be paid therefor.  **Investment Advisory Services** does not include Investment Banking Activity.

All other terms and conditions remain unchanged.

**Endorsement #17**                                              **Page 1 of 1**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## IMO ENDORSEMENT (VICARIOUS LIABILITY CLAIMS EXPENSES ONLY)

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, and solely with respect to coverage afforded by this endorsement, it is understood and agreed as follows:

I.   Section I, INSURING AGREEMENTS, is amended to include the following:

    **B.   VICARIOUS LIABILITY FOR INDEPENDENT MARKETING ORGANIZATIONS**

    The **Insurer** shall pay on behalf of the **Independent Marketing Organization** only **Claim Expenses** of the **Independent Marketing Organization** for which it becomes legally obligated to pay because of a **Claim** first made against the **Independent Marketing Organization** and reported in writing to the **Insurer** during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or during an Extended Reporting Period, if applicable, for any actual or alleged **Vicarious Liability** of the **Independent Marketing Organization** arising out of a **Wrongful Act** or **Interrelated Wrongful Act** of a **Registered Representative** in the performance or failure to perform **Professional Services**. In no event shall coverage provided by this policy apply to a **Wrongful Act** or **Interrelated Wrongful Acts** of the **Independent Marketing Organization**.

    Insuring Agreement I.B shall apply only if the **Wrongful Act** or **Interrelated Wrongful Act** of the **Registered Representative** is otherwise covered under the terms and conditions of this policy. Insuring Agreement I.B shall apply to **Claim Expenses** only, and shall not apply to **Damages** that may be incurred by the **Independent Marketing Organization**.

    Insuring Agreement I.B  shall apply only to a **Wrongful Act** or **Interrelated Wrongful Acts**  for which the **Registered Representative** is obligated to indemnify the **Independent Marketing Organization** for **Claim Expenses** pursuant to a written contract with such **Independent Marketing Organization** as respects the provision of **Professional Services** by a **Registered Representative** on behalf of the **Independent Marketing Organization**.

II.   Section IV.L, DEFINITION OF PROFESSIONAL SERVICES, is deleted in  its entirety and replaced with the following:

    **Professional Services** means those services rendered or required to be rendered in the Registered Representative's profession as:

    (1) a licensed life or accident and health insurance agent or general agent who is placing business with the **Independent Marketing Organization**; or

    (2) a licensed life or accident and health insurance agent or general agent who is placing business with insurance companies other than the **Independent Marketing Organization**;

provided, however, such services are rendered pursuant to a written contract between the **Registered Representative** and the **Independent Marketing Organization**, and such services have been approved by the **Broker/Dealer** to be performed by the **Registered Representative**.

III.   Section V, DEFINITIONS, is amended to include the following:

**Independent Marketing Organization** means the following entities only:

AimcoR Group LLC
Advantage Insurance Network Inc. (AIN)
Brokerage Resources of America, LLC (BRAMCO Financial Resources)
CAPITAS Financial Inc.
CRUMP Life Insurance Services
Financial Strategies Group, LLP (FSG)
Insurance Designers of America (IDA)
LifeMark Partners
Tellus Brokerage Connections
LIBRA Insurance Partners

**Vicarious Liability** means liability of the **Independent Marketing Organization** arising out of, based upon or attributable to a **Wrongful Act** or **Interrelated Wrongful Act** of a **Registered Representative**. **Vicarious Liability** shall not include liability for any **Wrongful Act** or **Interrelated Wrongful Acts** of the **Independent Marketing Organization**.

IV.   Section VII, LIMITS OF LIABILITY, are amended to include the following:

The Limits of Liability available to the **Independent Marketing Organization** for a **Claim** against it that is covered under Insuring Agreement I.B, as well as other terms, limitations, exclusions and conditions of the Policy, shall be shared with the Limits of Liability applicable to the **Registered Representative** implicated by the **Claim**.  Such Limits of Liability shall not be in addition to the **Registered Representative's** per **Claim** and Aggregate Limits of Liability and/or the Policy Aggregate Limit of Liability. As with all other **Insureds**, all of the **Insurer's** obligations as to the **Independent Marketing Organization**, including those pertaining to its defense, shall cease after the applicable Limits of Liability are paid by the **Insurer**.

V.   Section VIII, RETENTION, is amended to include the following:

The Retention applicable to the **Independent Marketing Organization** for a **Claim** against it that is covered under Insuring Agreement I.B, as well as other terms, limitations, exclusions and conditions of the Policy, shall be shared with the Retention applicable to the **Registered Representative** implicated by the **Claim**.

VI.   Section XV, OTHER INSURANCE, is amended to include the following:

Coverage provided by Insuring Agreement I.B shall apply only as excess over any other valid or collectible insurance carried by the **Independent Marketing Organization**.

All other terms and conditions remain unchanged.

**MARKEL®**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIFE, ACCIDENT & HEALTH ENDORSEMENT
### (NAILBA BGA'S ONLY)

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to any Brokerage General Agency (as defined in the "BGA Endorsement" attached to this policy) which:

a)   Is affiliated with The National Association of Independent Life Brokerage Agencies (NAILBA); and
b)   Was enrolled in the NAILBA group agency insurance policy immediately prior to becoming an **Insured** under this Policy; and
c)   Became an **Insured** under this Policy on or after December 31, 2014;

For the purpose of this Endorsement, Section IV, Definitions, Paragraph L. is deleted in its entirety and replaced with the following:

**L.   Professional Services** means the solicitation, sale or servicing of the following:

1.   Life or accident and health insurance, including long term care insurance;

2.   Workers' compensation insurance when **Insured** as part of a 24 hour coverage plan;

3.   Disability income insurance; and

4.   Fixed annuities including equity indexed annuities.

It is further understood and agreed that proof of affiliation with NAILBA and proof of previous enrollment in the NAILBA group agency insurance program shall be kept on file with Arthur J. Gallagher and shall be available for review by the **Insurer** upon request.

All other terms and conditions remain unchanged.

**Endorsement #19**                                                                                                        **Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL®**

# EVANSTON  INSURANCE  COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIFE SETTLEMENT REFERRAL ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, and solely with respect to coverage afforded by this endorsement, it is understood and agreed as follows:

I.   Section IV, DEFINITIONS, is amended to include the following:

**Life Settlement** means the sale by the policyholder, prior to the death of the policyholder, of all the rights and obligations (including, but not limited to, the policy's death benefits, and the obligation to pay any premium) of a term, variable, universal or whole life insurance policy, for a lump sum payment, provided that (i) the policyholder receives an amount greater than what would have been received by surrender of the policy; and (ii) the **Life Settlement** is memorialized in a written agreement between the policyholder and buyer of the policy.

II.   Section IV.L, DEFINITION OF PROFESSIONAL SERVICES, is deleted in its  entirety  and  replaced  with  the following:

**Professional Services** means the following service if rendered in accordance with the approval and authorization of the **Broker/Dealer** for or on behalf of a client of the **Broker/Dealer** and pursuant to a written agreement between the **Broker/Dealer** and the client:

(1)   the giving or making of referrals by an **Insured** to a **Life Settlement** broker provided that the **Insured**:

(i)   is in possession of all licenses and qualifications, required by any local, state, federal or self-regulatory authority, to make said referral; and

(ii)   is in compliance with all laws, rules, regulations, and requirements of local, state, federal, or self-regulatory authorities of any nature pertaining to such referral.

III.   Section V, EXCLUSIONS, is amended to include the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Claim**:

(aa)   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged guarantees, promises or warranties as to interest rates, market values, earnings, future values or future premiums or payments in connection with variable life insurance, universal life insurance, whole life insurance, variable annuities, flexible annuities, scheduled premium annuities, mutual funds, or **Life Settlements**;

(bb)   Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged **Life Settlement** relating to a term, variable, universal or whole life insurance policy where such policy was sold by the **Insured** within two (2) years of the life insurance policy's issue date;

**Endorsement #20**                                                                                                   **Page 1 of 2**

(cc)     Which is brought by or on behalf of any individual or entity other than a client of the **Insured** or such client's appointed administrator, executor, receiver or trustee in bankruptcy, for whom the **Insured** gave or made a **Life Settlement** referral;

(dd)     Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Claim** pending or prior litigation as of December 31, 2009, or alleging or derived from a **Wrongful Act**, **Interrelated Wrongful Act** and/or the same or essentially the same facts and circumstances as alleged in or giving rise to such pending or prior **Claim**;

(ee)     Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Wrongful Act** or **Interrelated Wrongful Act** occurring prior to December 31, 2009, if as of such date any Insured knew or could have reasonably foreseen that such **Wrongful Act** or **Interrelated Wrongful Act** could lead to **Claim**;

(ff)     Which is brought by or on behalf of any party other than the beneficiary of any insurance policy that is subject to a **Life Settlement**; however, this exclusion shall not apply to a **Claim** arising out of or based on an **Insured** providing a referral on a fee basis to a pre-existing client or customer;

(gg)     Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged rendering of or failure to render investment, tax or legal advice with respect to entering into a **Life Settlement**; and

(hh)     Which is brought by or on behalf of any investor, whether individual or entity, in a **Life Settlement**.

III.     The LIMITS OF LIABILITY set forth in the Declarations are amended to include the following:

The following Sub-Limits of Liability apply any **Claim(s)** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the giving or making of referrals by an **Insured** to a **Life Settlement** broker:

**Each Claim against each Insured - $1,000,000**

**Policy Aggregate as to all Claims against All Insureds - $1,000,000**

The foregoing Sub-Limits of Liability shall be within and not in addition to the Policy Aggregate Limit of Liability stated in the Declarations.

IV.     The RETENTION set forth in the Declarations is amended to include the following:

The following Retention applies any **Claim** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the giving or making of referrals by an **Insured** to a **Life Settlement** broker:

**Each Claim - $50,000**

V.     Section XV, OTHER INSURANCE, is amended to include the following:

The coverage provided by this endorsement is specifically excess over any other valid or collectible insurance maintained by the **Life Settlement** broker or any other party which provides coverage to the **Insured** for **Life Settlement** referrals, and shall only drop down and be primary insurance in the event of exhaustion of such other insurance due to losses paid thereunder.

All other terms and conditions remain unchanged.

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITED PARTNERSHIP/REIT INSOLVENCY EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, Section V, EXCLUSIONS, is amended to include the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Claim**:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any limited partnership, master limited partnership, real estate investment trust or any affiliated organization for any of the foregoing that actually or allegedly:

(i) admitting in writing its inability to pay its debts;

(ii) making a general assignment for the benefit of creditors,

(iii) being the subject of any proceeding seeking to adjudicate it bankrupt or insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or seeking appointment of a receiver, trustee or other similar official for it or for any substantial part of its property,

(iv) engaging in any business reorganization (including, without limitation, any transfer of all or substantially all its assets, "roll up," "roll over," or incorporation), or

(v) taking any corporate action to authorize any of the action set forth above.

Any **Claim** arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the matters set forth in (i) through (v) above, including, without limitation, any **Claim** alleging the violation of any of the provisions of the Securities Act of 1933, Securities Exchange Act of 1934, or any similar federal or state law, or any common law relating thereto shall be excluded from coverage under this Policy; provided however, this exclusion shall not apply to a **Claim** that is based upon the suitability of (i) any limited partnership, (ii) master limited partnership or (iii) real estate investment trust as a **Security** that is authorized or approved by and actually processed through the **Broker/Dealer**.

All other terms and conditions remain unchanged.

**Endorsement #21**                                                                                      **Page 1 of 1**

**MARKEL®**

PROFESSIONAL LIABILITY
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PROPERTY AND CASUALTY PRODUCTS COVERAGE

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

**A.** For the purpose of this Endorsement, the following is added to Paragraph **F.** Insured of Section **IV** – Definitions:

A **Property And Casualty Agent** contracted with the **Broker/Dealer**.

**B.** The following is added to Paragraph **K. 1. Professional Services** of Section **IV** – Definitions:

The purchase or sale of personal lines property and casualty insurance products, if rendered in connection with an Approved Activity, however, **Professional Services** shall not include the purchase or sale of commercial property and casualty insurance products, including but not limited to, commercial general liability, workers compensation, commercial auto insurance, business owner policies, commercial umbrella, commercial property or commercial package policies.

**C.** The following is added to Section **IV** – Definitions:

**Property And Casualty Agent** means an individual who:

**1.** Is contracted with the **Broker/Dealer**, which has approved rendering of **Professional Services** as defined in Paragraph **K.1.** of Section **IV** above;

**2.** Has paid the appropriate premium to enroll for coverage under this Policy and whose enrollment is on file with the **Broker/Dealer**; and

**3.** Is licensed by the appropriate authorities to solicit and sell property and casualty products and services.

**D.** Paragraph **G.** of Section **V** – Exclusions is replaced by the following:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged rendering of services as an actuary, accountant, attorney, real estate agent, real estate broker, third-party claims administrator, expert witness, nor services as an excess/surplus lines placement agent, regardless of whether such services are incidental to the rendering of **Professional Services**; however, this exclusion shall not apply to tax advice provided to a client as a necessary part of rendering **Professional Services**;

**E.** For the purpose of this Endorsement, the following is added to Section **VII** – Limits Of Liability:

With respect to all **Damages** from any **Claim** arising out of, based upon or attributable to, in whole or in part, or in any way relating to the purchase or sale of personal lines property and casualty insurance products by any **Insured**, the aggregate limit of the **Insurer's** liability for all such **Damages** shall be $1,000,000 per Claim $1,000,000 policy aggregate (hereinafter called the Property and Casualty Sublimit of liability). This Property and Casualty Sublimit of Liability shall be part of and not in addition to the Policy Aggregate of $10,000,000 stated on the Declarations page.

**F.** For the purpose of this Endorsement, the following is added to Section **VIII** – Retention:

Coverage provided by this Endorsement shall be subject to the same Retention set forth in Declarations as applicable to **Registered Representatives**.

All other terms and conditions remain unchanged.

**Endorsement #22**                                                                                              **Page 1 of 1**

**MARKEL**®

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE ERROR REIMBURSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

1.     For purposes of this Endorsement, the following INSURING AGREEMENT is added to the Policy:

      I.A  **TRADE ERROR REIMBURSEMENT**

      The Insurer shall reimburse the **Broker/Dealer** for **Trading Loss** which the **Broker/Dealer** becomes aware of during the **Policy Period,** or an Extended Reporting Period, if applicable, for a **Trading Error** committed on or after the **Retroactive Date** by an **Insured** solely in the rendering or failing to render **Professional Services**.

2.     For purposes of this Endorsement, the following is added to Section IV.C (DEFINITION OF CLAIM):

      With respect to the coverage provided under Section I.A INSURING AGREEMENT, **Claim** shall include a **Trading Error**.

3.     For the purposes of this Endorsement, the following are added to Section IV – DEFINITIONS:

      **Trading Error** means an **Insured's** negligent act, error or omission resulting in the failure to follow the directions of a client when purchasing or selling product defined in Section IV. 1. b. and 3 (**PROFESSIONAL SERVICES**) and which if not corrected, will likely result in a **Claim** as defined in Section IV.C.

      **Trading Loss** means the actual cost of correcting the transaction so that it conforms with the instructions of the **Insured's** client. **Trading Loss** shall not include any ex gracia payments or amount for which the **Insured** is not legally liable.

4.     For the purposes of this Endorsement, the following is added to Section VII – LIMIT OF LIABILITY:

      Coverage under Section I.A INSURING AGREEMENT (Trader Error Reimbursement) shall be subject to the Limits of Liability of $1,000,000 per **Trade Error** $1,000,000 policy aggregate.  This Limits of Liability shall be part of and not in addition to the aggregate Limits of Liability of $10,000,000 stated in the Declarations, which are included within and do not increase said Limits of Liability.

5.     For the purposes of this Endorsement, the following is added to Section VIII – RETENTION:

      The Retention applicable for **Trade Errors** that are covered under Section II.A INSURING AGREEMENT, as well as all other terms, provisions, exclusions and conditions of the Policy, shall be $50,000 for the **Named Insured** and/or $5,000 for the **Registered Representative**.

      If the **Named Insured** and the **Registered Representative** are named in a **Trade Error**, a single Retention shall apply.  The single Retention that shall apply to such **Trade Error** is the largest applicable Retention.

All other terms and conditions remain unchanged.

**Endorsement #23**

**Page 1 of 1**



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BROKER/DEALER FIDUCIARY STANDARD OF CARE ENDORSEMENT

In consideration of the premium charged, it is agreed as follows:

I.   Section IV.C of the Policy – Definition of **Claim** -- is amended to include the following:

    4.   A civil litigation against the **Broker/Dealer** for which plaintiff(s) seek class action certification, or an arbitration against the **Broker/Dealer** involving multiple claimants who assert that their demands involve common questions of law and fact, which is based solely on alleged violations of regulations brought forth by any state or regulatory authority which allow for an exception to the fiduciary standard of care applied to services rendered for ERISA plans and IRAs.

    This Endorsement shall not apply to any **Claim** against a **Registered Representative**, as defined in Subsection 4 above.

II.   Solely with respect a **Claim** as defined in Subsection 4 above, the Policy's Limits of Liability Section is amended to include the following:

    Sub-Limits of Liability

        Broker/Dealer Each Claim:  $2,000,000

        Broker/Dealer Aggregate:   $4,000,000

    The foregoing Sub-Limits of Liability shall be within, and not in addition to, the Broker/Dealer Aggregate and Policy Aggregate Limits of Liability stated in the Policy's Declarations.

III.   Solely with respect a **Claim** as defined in Subsection 4 above, the Policy's Retention Section is amended to include the following:

    Retention

        Broker/Dealer Each Claim: $150,000

All other terms and conditions remain unchanged.

**MARKEL**®

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NON-REGISTERED REPRESENTATIVE COVERAGE

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

**A.** For the purposes of this Endorsement, the following is added to Paragraph **F. Insured** of Section **IV** – Definitions:

A **Life Agent** contracted with the **Broker/Dealer**, (but not as a **Registered Representative**) and only with respect to rendering of or failing to render **Professional Services** as defined herein.

**B.** For the purposes of this Endorsement, the following is added to Section **IV** – Definitions:

**Life Agent** means an individual who:

**1.** Maintains a life insurance agent only contract with the **Broker/Dealer**;

**2.** Has elected to enroll for coverage under this Policy and whose enrollment is on file with the **Broker/Dealer**; and

**3.** Is licensed by the appropriate authorities to solicit and sell life, accident, and health insurance products and services.

**C.** For the purposes of this Endorsement, Paragraph **L.** (**Professional Services**) is deleted in its entirety, and replaced with the following:

**Professional Services** means:

**1.** The solicitation, sale or servicing of the following:

   **a.** Life insurance, accident and health insurance, disability income insurance and fixed annuities;

   **b.** Variable insurance products, including, but not limited to, variable annuities, flexible and scheduled premium annuities and variable life insurance; and

**2.** The solicitation, sale or administration of employee benefit plans, such as group or ordinary pension or profit sharing plans, retirement annuities and life, accident and health or disability plans that are funded with the products set forth in Paragraph **1.** above.

   **Professional Services** shall not include the solicitation, sale or administration of the following:

   **a.** Multiple Employer Welfare Arrangements or Voluntary Employee Beneficiary Associations, as defined by the Employee Retirement Income Security Act of 1974 and any amendments thereto; or

   **b.** Section 79, 83, 412, 419 Plans or any other plans developed to provide tax deductions and advantages under the Internal Revenue Code, amendments thereto and any regulations promulgated thereunder.

**3.** Financial planning, but only if performed directly in conjunction with the sale, solicitation or servicing of the products referenced in Paragraph **1.** above.

**D.** For the purpose of this Endorsement, the following is added to Section **VII.** – Limits Of Liability:

Coverage provided by this Endorsement shall be subject to the Limits Of Liability set forth in Declarations and shall be included within, and shall not increase in any way, such Limits Of Liability.

**Endorsement #25**                                                                                                    **Page 1 of 2**

**E.** For the purpose of this Endorsement, the following is added to Section **VIII.** – Retention:

Coverage provided by this Endorsement shall be subject to the same Retention set forth in Declarations as applicable to **Registered Representatives**.

All other terms and conditions remain unchanged.

**MARKEL®**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BROKERGE GENERAL AGENCY OPTIONAL LIMITS OF LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of an additional premium charged, as determined by the **Insurer** for coverage hereunder, a **Brokerage General Agency**, which qualifies as an **Insured**, in accordance with a preceding Endorsement to the Policy (including the The Leaders Group, Inc. when acting in the capacity as a **Brokerage General Agency**), may elect to purchase the optional Limits of Liability stated in Paragraph 1 below, with respect to **Claim(s)** solely for a **Wrongful Act** or **Interrelated Wrongful Act** by a **Brokerage General Agency** in the rendering or failure to render **Professional Services** pursuant to a valid and enforceable contract with UBS and/or Morgan Stanley.

A **Brokerage General Agency** that elects to purchase the optional Limits of Liability stated in Paragraph 1 below must be included on a roster maintained by or on behalf of the **Broker/Dealer Policy Holder**, which evidences payment of the additional premium for the coverage hereunder prior to a **Wrongful Act** or **Interrelated Wrongful Act** giving rise to **Claim(s)** solely in the rendering or failure to render **Professional Services** pursuant to a valid and enforceable contract with UBS and/or Morgan Stanley. Such roster, which includes the date when optional coverage hereunder was purchased by a **Brokerage General Agency**, is to be made available to the **Insurer** upon its request.

1.  Optional Limits of Limit of Liability:

    $5,000,000 each **Claim**; and

    $5,000,000 Aggregate.

    The foregoing Optional Limits of Liability, if purchased by a **Brokerage General Agency**, shall replace the each **Claim** and Aggregate Limits of Liability stated in the Policy's Declarations with respect to **Claim(s)** solely for a **Wrongful Act** or **Interrelated Wrongful Act** by a **Brokerage General Agency** in the rendering or failure to render **Professional Services** pursuant to a valid and enforceable contract with UBS and/or Morgan Stanley.

    However, the foregoing Optional Limits of Liability shall be part of, and not in addition to, the Policy Aggregate Limit of Liability stated in the Declarations. Under no circumstances shall these Optional Limits of Liability be deemed to increase the Policy Aggregate Limit of Liability.

2.  Solely for the purposes of the coverage provided by this Endorsement, Section **I**, **Insuring Agreement**, Subsection **B.**, is deleted in its entirety and replaced with the following:

    Prior to the inception date of the first uninterrupted valid and enforceable contract between The Leader Groups, Inc. and UBS and/or Morgan Stanley to render **Professional Services**, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** and/or **Interrelated Wrongful Act** could result in a **Claim**.

3.  Solely for the purposes of the coverage provided by this Endorsement, Policy Section **IV**, **Definition O. – Retroactive Date** – is deleted in its entirety and replaced with the following:

December 31, 2017.

4.  Solely for the purposes of the coverage provided by this Endorsement, Policy Section **V**, Exclusion **C.2.** is deleted in its entirety and replaced with the following:

Any:

**a.**    **Claim**, demand, suit, proceeding or investigation of which the **Insured** had knowledge, pending on or prior to the inception date of the first uninterrupted valid and enforceable contract between The Leader Groups, Inc. and UBS and/or Morgan Stanley to render **Professional Services**; or

**b.**    Fact, matter, circumstance, situation, transaction or event underlying or alleged in such demand, suit, proceeding, **Claim** or investigation, regardless of the legal grounds upon which such **Claim** is predicated.

All other terms and conditions remain unchanged.

**Endorsement #26**                                                                                                                    **Page 2 of 2**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV7PLBD00034

**MARKEL**®

# EVANSTON  INSURANCE  COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CYBER MANAGEMENT WITH EXTORTION DEMAND, BUSINESS INTERRUPTION AND NETWORK RESTORATION COST COVERAGE

This endorsement modifies insurance provided under the following:

BROKER/DEALER AND REGISTERED REPRESENTATIVES PROFESSIONAL LIABILITY INSURANCE POLICY

**SCHEDULE**

| | |
|---|---|
| Cyber Management Limits of Liability: | $250,000 Each Claim |
| | $250,000 Insured Aggregate |
| Cyber Management Retention: | $1,000    Each Claim |
| Extortion Payment Limit of Liability: | $250,000 Each Extortion Demand |
| | $250,000 Insured Aggregate |
| Extortion Payment Retention: | $1,000    Each Extortion Demand |
| First Party Loss Limit of Liability: | $250,000 Each Exploit or Network Impairment |
| | $250,000 Insured Aggregate |
| First Party Loss Retention | $1,000    Each Exploit or Network Impairment |
| Total Aggregate Limit of Liability: | $2,000,000 As to All Claims, Extortion Demands, Exploits and Network Impairments |

**A.**  The following are added to Section **I** – Insuring Agreements:

**Cyber Management**

**1.**  The **Insurer** shall pay, on behalf of the **Insured**:

    **a.**  **Cyber Management Expenses** incurred by an **Insured** with the **Insurer's** prior written consent that are a direct result of a **Security Breach**, **Privacy Violation** or **Interrelated Breaches/Violations**, provided the **Cyber Management Expenses** are reported to the **Insurer** during the **Policy Period**, or as allowed by Section **X** – Notice of Claim, or during an Extended Reporting Period, if applicable;

    **b.**  **Damages** and **Claim Expenses** which an **Insured** shall become legally obligated to pay because of actual monetary loss by the **Insured's** client as the direct result of a **Security Breach, Privacy Violation** or **Interrelated Breaches/Violations**, provided a **Claim** is both made against the **Insured** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice of Claim, or during an Extended Reporting Period, if applicable; and

    **c.**  **Credit Monitoring Costs** incurred by an **Insured** with the **Insurer's** prior written consent that are the direct result of a **Security Breach** or **Privacy Violation** that directly results in theft or unauthorized copying of

**Personal Information** and may reasonably be expected to result in **Identity Theft**, provided the **Credit Monitoring Costs** are reported to the **Insurer** during the **Policy Period**, or as allowed by Section **X** – Notice of Claim, or during an Extended Reporting Period, if applicable.

2. This **Cyber Management** coverage applies only if:

   a. Such **Security Breach**, **Privacy Violation** or any **Interrelated Breaches/Violations** occurred on or after the **Retroactive Date** and before the end of the **Policy Period**; and

   b. As of the inception date of this Policy as shown in the Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Security Breach**, **Privacy Violation** or any **Interrelated Breaches/Violations** could result in **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** or any loss that may be sustained by a client.

**Extortion Demand**

The **Insurer** shall reimburse the **Insured** for:

**Extortion Payment** resulting from an **Extortion Demand**, in excess of the **Extortion Payment** Retention and up to the **Extortion Payment** Limits of Liability, provided that:

   a. The **Extortion Demand** is first made against the **Insured** and reported to the **Insurer** in writing during the **Policy Period** or during an Extended Reporting Period, if applicable, in accordance with the Section **X** – Notice of Claim; and

   b. The **Extortion Payment** is incurred within twelve months after the date that the **Insured** reports the **Extortion Demand** in accordance with the Section **X** – Notice of Claim, and such amounts are consented to in writing by the **Insurer**, such consent not to be unreasonably withheld.

**Business Interruption and Network Restoration Costs**

The **Insurer** shall pay on behalf of the **Insured** all **First Party Loss** in excess of the **First Party Loss** Retention and up to the **First Party Loss** Limits of Liability that the **Insured** incurs:

   a. **Business Interruption Coverage and Extra Expense**

   for **Business Income and Extra Expense** resulting from an **Exploit** that first causes **Network Impairment** during the **Policy Period**, provided that such **Exploit** is reported to the **Insurer** in writing during the **Policy Period** or during an Extended Reporting Period, if applicable, in accordance with the Section **X** – Notice of Claim.

   b. **Loss of or Damage to Insured's Network**

   for the **Insured's** reasonable and necessary expenses resulting from an **Exploit** that first causes **Network Impairment** during the **Policy Period**, provided that such **Exploit** is reported to the **Insurer** in writing during the **Policy Period** or during an Extended Reporting Period, if applicable. in accordance with the Section **X** – Notice of Claim, that are required to restore the **Network** or information residing on the **Network** to the form in which it existed immediately prior to such **Exploit**.

B. For the purpose of this endorsement, the following definitions in Section **IV** – Definitions are amended:

   D. **Claim Expenses** do not include **Cyber Management Expenses**, **Credit Monitoring Expenses**, **Extortion Payments** or **First Party Loss**.

   R. **Wrongful Act** also means **Network Security Breach**, **Privacy Violation**, or any **Interrelated Breaches/Violations**, but only with respect to **Cyber Management** coverage.

C. For the purpose of this endorsement, the following definitions are added to Section **IV** – Definitions:

**Business Income and Extra Expense** means:

1. the amount of net income, before interest, tax, depreciation or amortization, that the **Insured** would have earned during the period of time when **Network Impairment** caused by an **Exploit** commences and ending when such **Network Impairment** is corrected, allowing the resumption of **Professional Services**; and

**2. Extra Expense**;

however, **Business Income and Extra Expense** does not include:

1. ordinary operating expenses incurred by the **Insured** during the period of time when **Network Impairment** commences and ending when such **Network Impairment** is corrected, allowing the resumption of **Professional Services**;

2. costs or expenses to update, upgrade, enhance, or replace the **Insured's Network** beyond that which existed prior to the occurrence of the **Network Impairment**;

3. costs or expenses the **Insured** incurs to prove or document **First Party Loss**;

4. **Cyber Management Expenses**;

5. **Damages** and **Claim Expenses**;

6. **Credit Monitoring Expenses**; and/or

7. **Extortion Payments**.

**Credit Monitoring Costs** means the costs for retaining a third party service provider approved by the **Insurer** and with the **Insured's** prior written consent to provide **Credit Monitoring Services** to those individuals who were victims of theft or unauthorized copying of **Personal Information**.

**Credit Monitoring Services** means the services that allow individuals to access and review their credit reports to determine if **Identity Theft** has occurred.

**Cyber Management Expenses** means necessary and reasonable expenses to hire an attorney, selected from the **Insurer's** panel counsel, to determine whether any breach notice laws apply and the obligations of any such applicable laws including the drafting of letters to satisfy the applicable law, including the cost to notify those effected by the **Network Security Breach** or **Privacy Violation**, or to provide **Credit Monitoring Services** to the **Insured's** clients. **Cyber Management Expenses** shall also include approved expenses to respond to a regulatory action commenced or pending solely against the **Insured**, and the hiring of a public relations firm to communicate with the **Insured's** clients in order to mitigate the reputational damage of the **Insured** directly resulting from a **Network Security Breach** or **Privacy Violation**.

**Exploit** means **Network Impairment** or a series of related **Network Impairments** by a third party, and not any **Insured**.

**Extortion Demand** means an incident or series of related incidents occurring during the **Policy Period** where an **Insured** receives a threat to launch an attack on, to suspend, or to otherwise disrupt a **Network,** disrupt or deface the **Insured's** website or release or use **Personal Information** in the **Insured's** care, unless monies are paid or specified action is taken, and an **Insured** believes there is an imminent and probable danger of such action. An **Extortion Demand** does not include any demand seeking monies from the **Insured** that are allegedly due and owing pursuant to contract or operation of law.

**Extortion Payment** means all reasonable and necessary expenses incurred by the **Insured** with the **Insurer's** prior consent, in order to respond to an **Extortion Demand**, including payment of monies demanded by an extortionist. **Extortion Payments** do not include such expenses to the extent the **Insured** has recovered such expenses or been reimbursed for them from any other source. **Extortion Payments** do not include **Damages**, **Claim Expenses**, **Cyber Management Expenses**, **Credit Monitoring Expenses**, **Business Income and Extra Expense** and/or **First Party Losses**.

**Extra Expense** means any reasonable and necessary expenses, in excess of the **Insured's** normal operating expenses, that the **Insured** incurs during period of time when **Network Impairment** commences and ending with **Network Impairment** is corrected, allowing the resumption of **Professional Services**, including:

1. reasonable expense incurred to minimize the interruption of **Professional Services** not otherwise covered by this Policy;

2. reasonable expense incurred to resume **Professional Services** on a temporary basis, including those associated with securing temporary third party Internet service provider services, temporary website and/or e-mail hosting services, rental of temporary **Networks**, other temporary equipment or service contracts; and

3. reasonable expense incurred to engage a third party security expert to:

   a. investigate, minimize and stop damage to the **Network** caused by the **Exploit** while such **Exploit** is ongoing; and

   b. collect, analyze and preserve forensic evidence of an **Exploit** for use in identifying the perpetrator responsible for the disruption to **Professional Services**.

**First Party Loss** means amounts which the **Insurer** is obligated to pay as set forth in the **Business Interruption and Network Restoration Costs** Insuring Agreement.

**Identity Theft** means the theft or unauthorized copying of **Personal Information** of a client of the **Insured**, and use of such **Personal Information** to open new financial accounts for the purpose of fraudulently impersonating such individual, including without limitation, payment card accounts, bank accounts, loan accounts, health insurance accounts and insurance accounts.

**Insured's Computer System** means any computer hardware, software or firmware, and components thereof including data stored thereon, that is owned or leased by an **Insured** and is under the direct operational control of an **Insured.**

**Interrelated Breaches/Violations** means **Security Breaches** and/or **Privacy Violations** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**Network** means a local or wide area network owned or operated by or on behalf of or for the benefit of the **Broker/Dealer**; provided, however, **Network** shall not include the internet, telephone company networks, or other public infrastructure network (collectively "public infrastructure network"), unless such public infrastructure network is operated and controlled exclusively by the **Broker/Dealer**.

**Network Impairment** means the disruption, modification, destruction or damage to the **Insured's Network** that results in the impairment of the **Insured's Network** to such an extent that the **Insured** is substantially unable to conduct **Professional Services**.

**Personal Information** means:

1. The name of an **Insured's** client in combination with any one or more of the following:

   a. Social security number;

   b. Driver's license number or any other state identification number;

   c. Medical or healthcare data including protected health information; or

   d. Any financial account number, credit or debit card number in combination with any required password, access code or other security code that would permit access to the financial account;

   not including any lawfully available data accessible by the general public; or

2. Non-public personal information as defined in any **Privacy Regulation**.

**Privacy Regulation** means those parts of the following statues or regulations regulating the use and protection of non-public personal information (as defined in such statutes or regulations):

1. Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder as amended;

2. Gramm-Leach Bliley Act of 1999 (GLBA) and the rules and regulations promulgated thereunder, as amended;

3. Consumer protection and unfair and deceptive trade practice laws enforced by state Attorneys General or the Federal Trade Commission, including but not limited to, Section 5(a) of the FTC Act 15;

4. Security breach notification laws that require notice to individuals of the actual or potential theft of their non-public personal information, including but not limited to, the California Security Breach Notification Act of 2003 (CA SB 1386); or

5. Other state, federal or foreign privacy laws requiring reasonable security for non-public personal information, or a privacy policy limiting the sale, disclosure or sharing of non-public personal information or providing individuals with the right to access or correct non-public personal information.

**Privacy Violation** means any:

1. Theft of **Personal Information** while in the care, custody or control of an **Insured**; or

2. Violation of a **Privacy Regulation**.

**Security Breach** means:

1. The actual failure and inability to prevent:

   a. Unauthorized access to or unauthorized use of **Personal Information** stored in the **Insured's Computer System**; or

   b. The theft or unauthorized copying of **Personal Information** on the **Insured's Computer System**; or

2. The actual failure and inability to prevent the theft of **Personal Information** as a result of the physical theft by a person other than an **Insured** of the **Insured's Computer System** from premises occupied and controlled by the **Insured**.

D. For the purposes of this endorsement, the following are added to Section **V** – Exclusions:

This Policy shall not apply to, and the **Insurer** shall pay neither **Cyber Management Expenses**, **Credit Monitoring Costs, Damages**, **Claim Expenses**, **Extortion Payments** nor **First Party Loss**:

1. Arising out of, based upon or in consequence of, directly or indirectly resulting from of in any way involving any actual or alleged:

   a. Costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

   b. Wear and tear or gradual deterioration of any data saved on an **Insured's Computer System** or a **Network**;

   c. Costs or expenses incurred by any **Insured** or others:

      (1) To recall, repair, withdraw, replace, upgrade, supplement or remove the **Insured's** online content, products or services from the marketplace, including but not limited to products or services which incorporate the **Insured's** online content, products or services; or

      (2) For any loss of use by any **Insured** or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplement or removal.

   d. Failure to use best efforts to install commercially available software product updates and releases, or to apply security related software patches, to computers and other components of the **Insured's Computer System** or a **Network**;

   e. Seizure, confiscation, destruction or nationalization of **Insured's Computer System** or a **Network**; or any data accessed by or on behalf of any governmental or public authority;

   f. Interruption, suspension, failure or outage of any component of the Internet, including without limitation any hardware or software infrastructure supporting the Internet;

   g. Fine or penalty arising out of any agreement by any **Insured** to comply with or follow the PCI Standard or any Payment Card Company rules, or to implement, maintain or comply with any security measure(s) or standards related to any payment card data;

   h. Unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, "pop-up" or "pop-under" Internet advertising or fax-blasting, direct mailing or telemarketing, or actual or alleged violations

of the Telephone Consumer Protection Act, of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statue, law or regulation relating to a person's right to seclusion; or

**i.**  Unauthorized or illegal collection of **Personal Information**, including but not limited to the collection of **Personal Information** using cookies, spyware, or other malicious code, or the failure to provide adequate notice that **Personal Information** is being collected;

**2.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from of in any way involving any section 605 (requirements relating to information contained in consumer reports) or Section 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

**3.**  Covered in whole or in part under any other insurance.

**E.**  For purposes of this endorsement, the following is added to Section **VII** – Limits of Liability:

**Cyber Management Limits of Liability**

The Cyber Management Limits of Liability are subject to Paragraphs **A.** and **B.** of Section **VII** – Limits of Liability.

Subject to the Cyber Management Limits of Liability Insured Aggregate, the limit of the **Insurer's** liability for **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** and **Claim Expenses** incurred in each **Network Security Breach** or **Privacy Violation** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit of Liability Each Claim shown in the Schedule of the endorsement.   The inclusion of multiple **Insureds** or clients in **Interrelated Breaches/Violations** shall not increase the applicable Limit of Liability Each Claim shown in the Schedule of this endorsement.

The Limit of Liability for all **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** and **Claim Expenses** incurred in all **Network Security Breaches** or **Privacy Violations** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the Cyber Management Limit of Liability Insured Aggregate shown in the Schedule of this endorsement.

The Cyber Management Limit of Liability Each Claim and Cyber Management Limit of Liability Insured Aggregate are part of, subject to and do not increase the Total Aggregate Limit of Liability as shown in the Schedule of this endorsement.

The **Insurer's** obligations under this Policy, including the duty to defend, shall cease after the applicable Limits of Liability has been paid by the **Insurer** for **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** or **Claim Expenses**.

The Cyber Management Limits of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits of Liability shown in the Declaration.

**Extortion Payment and First Party Loss Limits of Liability**

The Extortion Payments and First Party Loss Limits of Liability are subject to Paragraphs **A.** and **B.** of Section **VII** – Limits of Liability.

Subject to the Extortion Payments and First Party Loss Limits of Liability Insured Aggregates, the limit of the **Insurer's** liability for **Extortion Payments**, **Business Income and Extra Expenses** and **First Party Losses** incurred in each **Extortion Demand**, **Exploit** or **Network Impairment** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit of Liability Each **Extortion Payment** or **First Party Loss** shown in the Schedule of the endorsement.  The inclusion of multiple **Insureds** or clients in an **Extortion Demand**, **Exploit** or **Network Impairment** shall not increase the applicable Limit of Liability Each **Extortion Payments** or **First Party Loss** shown in the Schedule of this endorsement.

The Limit of Liability for all **Extortion Payments**, **Business Income and Extra Expenses** and **First Party Losses** incurred in all **Extortion Demands**, **Exploits** or **Network Impairments** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the Extortion Payment and First Party Loss Limits of Liability Insured Aggregates shown in the Schedule of this endorsement.

The Extortion Payment and First Party Loss Limits of Liability Each Claim and Extortion Payment and First Party Loss Limits of Liability Insured Aggregate are part of, subject to and do not increase the Total Aggregate Limit of Liability as shown in the Schedule of this endorsement.

The **Insurer's** obligations under this Policy shall cease after the applicable Limits of Liability has been paid by the **Insurer** for **Extortion Payments**, **Business Income and Extra Expense** and/or **First Party Losses**.

The Extortion Payment and First Party Loss Limits of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits of Liability shown in the Declaration.

**Total Aggregate Limit of Liability**

The **Insurer's** liability for all **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs**, **Claim Expenses**, **Extortion Payments**, **Business Income and Extra Expenses** and/or **First Party Losses** incurred in all **Network Security Breaches**, **Privacy Violations**, **Extortion Demands**, **Exploits** or **Network Impairments** shall not exceed the Total Aggregate Limit of Liability shown in the schedule of this endorsement. All of the **Insurer's** obligations under the Policy shall cease when the Total Aggregate Limit of Liability has been paid, regardless of whether **Network Security Breaches**, **Privacy Violations**, **Extortion Demands**, **Exploits** or **Network Impairments** have been resolved.

The Total Aggregate Limits of Liability shown in the Schedule of this endorsement is part of, and not in addition to the Limits of Liability shown in the Declaration.

**F.** Section **VIII** – Retention is amended to include the following:

The Retentions, shown in the Schedule of this endorsement, apply to **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs**, **Claim Expenses**, **Extortion Payments**, **Business Income and Extra Expenses** or **First Party Loss** incurred in each **Network Security Breach**, **Privacy Violation**, **Interrelated Breaches/Violations**, **Extortion Demand**, **Exploit** or **Network Impairment**. The Limits of Liability shown in the Schedule of this endorsement shall apply in excess of the Retentions, which are the sole responsibility of the **Insureds** and will remain uninsured.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

**MIL 1214 09 17**                                                                                                    **Page 1 of 1**

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

FINANCIAL DESIGNS, INC.,

      Plaintiff,

v.

EVANSTON INSURANCE COMPANY,

      Defendants.

Case No.: 2022-008424-CA-01

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on the following defendant:

**EVANSTON INSURANCE COMPANY**
**10275 WEST HIGGINS ROAD, SUITE 750**
**ROSEMONT, IL 60018**

DATED on _____

CLERK OF THE CIRCUIT COURT

Harvey Ruvin
As Clerk of the Court

By: _____
       As Deputy Clerk

Juan J. Rodriguez, Esq.
Florida Bar No. 613843
Email: jrodriguez@careyrodriguez.com; service@careyrodriguez.com
CAREY RODRIGUEZ MILIAN, LLP
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Tel. (305) 372-7474
*Counsel for Plaintiff*

<u>IMPORTANT</u>

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court.  A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court.  There are other legal requirements.  You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente.  Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por esrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denomidada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete enterprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger.  Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assitance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

FINANCIAL DESIGNS, INC.,

      Plaintiff,

v.                                Case No.: 2022-008424-CA-01

EVANSTON INSURANCE COMPANY,

      Defendants.

_____

### SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on the following defendant:

**EVANSTON INSURANCE COMPANY**
**10275 WEST HIGGINS ROAD, SUITE 750**
**ROSEMONT, IL 60018**

DATED on 5/24/2022 _____      CLERK OF THE CIRCUIT COURT



                             Harvey Ruvin
                             As Clerk of the Court

                                      32429
                             By: _____
                                   As Deputy Clerk

Juan J. Rodriguez, Esq.
Florida Bar No. 613843
Email: jrodriguez@careyrodriguez.com; service@careyrodriguez.com
CAREY RODRIGUEZ MILIAN, LLP
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Tel. (305) 372-7474
*Counsel for Plaintiff*

<u>IMPORTANT</u>

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court.  A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court.  There are other legal requirements.  You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

<u>IMPORTANTE</u>

Usted ha sido demandado legalmente.  Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por esrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denomidada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

<u>IMPORTANT</u>

Des poursuites judiciares ont ete enterprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger.  Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assitance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

## CERTIFICATE OF SERVICE

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT          Case #: 2022-008424-CA-01
IN AND FOR MIAMI-DADE COUNTY, STATE OF FLORIDA

**Financial Designs, Inc.**

Plaintiff

**vs.**

**Evanston Insurance Company**

Defendant

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all the times herein mentioned was a citizen of the United States, over the age of 18, not a party to nor interested in the above entitled action, is competent to be witness therein, and that I served copies of the:

**Summons & Complaint**

| | |
|---|---|
| PARTY SERVED: | **EVANSTON INSURANCE COMPANY** |
| PERSON SERVED: | **ELLA LIBERMAN, ATTORNEY** |
| METHOD OF SERVICE: | **Corporate -** By leaving copies with the person identified above, apparently in charge at the office or usual place of business. I informed him/her of the general nature of the papers. |
| DATE & TIME OF DELIVERY: | **05/25/2022 at 12:19 PM** |
| ADDRESS, CITY AND STATE: | **10275 W. HIGGINS RD., STE 750, ROSEMONT, IL 60018** |
| DESCRIPTION: | Race: **White**   Sex: **Female**   Age: **38**  Height: **5'4"**   Weight: **140**   Hair: **Brown**   Glasses: **No** |

DLE Process Servers, Inc.
1750 Coral Way
Miami, FL 33145
(786) 220-9705

I declare under penalties of perjury that the information contained herein is true and correct. Executed on 5/26/2022.

Signature: _____

Kerry Polizzi
Registration No: 117-001119

CLIENT: **DLE Process Servers, Inc.**                                    Job #: **494607**
FILE #: **2022021706**

Filing # 149748698 E-Filed 05/17/2022 02:10:05 PM

### IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
### IN AND FOR MIAMI-DADE COUNTY, FLORIDA

FINANCIAL DESIGNS, INC.,

      Plaintiff,

v.

EVANSTON INSURANCE COMPANY,

      Defendants.

Case No.: 2022-008424-CA-01

*5/25/22*
*12:9 pm*
*Ella*
*Liberman*

*KP*
*17-001119*

### <u>SUMMONS</u>

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this lawsuit on the following defendant:

**EVANSTON INSURANCE COMPANY**
**10275 WEST HIGGINS ROAD, SUITE 750**
**ROSEMONT, IL 60018**

DATED on   5/24/2022                    CLERK OF THE CIRCUIT COURT



Harvey Ruvin
As Clerk of the Court

*Christina Figueroa* 32429

By: _____
        As Deputy Clerk

Juan J. Rodriguez, Esq.
Florida Bar No. 613843
Email: jrodriguez@careyrodriguez.com; service@careyrodriguez.com
CAREY RODRIGUEZ MILIAN, LLP
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Tel. (305) 372-7474
*Counsel for Plaintiff*

## IMPORTANT

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court.  A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por esrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denomidada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete enterprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger.  Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assitance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.